UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| | ) | Chapter 7 Case |
| FINE DIAMONDS, LLC | ) | No. 09-10492 (REG) |
| Debtor. | ) | |
| | ) | |
| GREGORY MESSER, THE CHAPTER 7 TRUSTEE OF FINE DIAMONDS, LLC, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| v. | ) | No. 09-01033 (REG) |
| | ) | |
| PEYKAR INTERNATIONAL CO., INC., MEHRDAD PEYKAR, a/k/a MITCHELL PEYKAR AND MEHRAN PEYKAR | ) ) ) | |
| Defendants. | ) ) | |

BENCH DECISION[1] ON PEYKARS' MOTION
TO VACATE DETERMINATION STRIKING
DIRECT TESTIMONY DECLARATIONS

APPEARANCES:

WILK AUSLANDER LLP
*Counsel for Nedbank Ltd. and Chapter 7 Trustee Gregory Messer*
675 Third Avenue, 9th Floor
New York, New York 10017
By:    Eric J. Snyder, Esq.
         Alan D. Zuckerbrod, Esq.

SEAN E. STANTON, ESQ.
*Counsel for Peykars Peykar Intl., Mitch Peykar, & Mehran Peykar*
1799 Lexington Avenue
New York, New York 10029
By:    Sean E. Stanton, Esq.

---

[1]    I use bench decisions to lay out in writing decisions that are too long, or too important, to dictate in open court, but where the circumstances do not permit more leisurely drafting or more extensive or polished discussion. Because they often start as scripts for decisions to be dictated in open court, they typically have a more conversational tone.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

In this adversary proceeding under the chapter 7 case of Fine Diamonds LLC (the "**Debtor**"), Defendants Mitchell Peykar and Mehran Peykar (the "**Peykars**"),[2] and Peykar International, move to vacate my determination striking the Peykars' direct testimony declarations after they failed to appear for cross examination at trial without explanation. They contend, as described more fully below, that on the morning they were to be cross-examined, Mitch thought he was dying and needed to go to a cardiologist instead of to the Court; that Mehran had to take him; and that neither was able to contact the Court or their counsel throughout the entirety of that day.

Their counsel contends, understandably, that striking their direct testimony declarations will result, as a practical matter, in the inability on their part to present their defense on the merits, and likely result in a judgment against them. And their counsel further observes that the Peykars are being sued for a great deal of money. But against this must be balanced my finding, after an evidentiary hearing, that the testimony proffered by each was wholly non-credible. And even if truthful, it would not justify the failure to appear without explanation.

Fully recognizing the consequences of this determination, I determine that my ruling striking their direct testimony stands. For reasons set forth at length below, I find their testimony at the evidentiary hearing, and the declarations that preceded it, to be, frankly, an insult to my intelligence. If true, their accounts easily could have been corroborated, but they were not. And this failure to corroborate, combined with the exaggeration in their stories and the implausibility of their accounts, makes their purported explanations unworthy of belief.

---

[2]    In this decision, Mitchell and Mehran Peykar often will be referred to by their first names for the purpose of distinguishing them. Typically, Mitchell Peykar will be referred to as "Mitch," since that is how his name appears in most of the exhibits, affidavits, and testimony.

<u>Findings of Fact</u>

*1. Background*

On February 4, 2009, an involuntary chapter 7 petition was filed against Fine Diamonds LLC and Yondor Diamonds by petitioning creditor, Nedbank Ltd. ("**Nedbank**").  The same day, Nedbank filed an adversary proceeding complaint against the Peykars seeking to recover, on behalf of the Fine Diamonds estate, nearly $37 million of diamonds that the Peykars allegedly converted or embezzled from the Debtor.  An involuntary summons was issued in the main chapter 7 case on February 5, 2007, and thereafter, the petitioning creditor Nedbank moved for the immediate appointment of a chapter 7 trustee.  Gregory Messer was subsequently appointed as the Chapter 7 Trustee.

The trial in this adversary proceeding was originally set for January 27, 2011.  The Chapter 7 Trustee's trial witnesses were designated as Doran Meents and Lester Meents, who are former principals of the Debtor.  Mitch and Mehran were the only two witnesses indentified for the Peykars.   As is customary in my cases and as provided in the Case Management Order, the direct testimony of all witnesses was to be taken by affidavit or declaration, and cross-examination, redirect, and any subsequent testimony would be taken live.

On January 17, 2011—just 10 days before the originally-scheduled trial date—Paul Millus, the Peykars' counsel at the time, sought permission from the Court to withdraw.  Duly protecting the attorney-client privilege, Millus was not specific in saying why, other than to attribute it to differences with his clients.  The Peykars informed me not only that they didn't oppose Millus' request, but that they supported it.  I granted Millus' request to withdraw as counsel, and upon the Peykars' request, pushed back the trial date to February 17, 2011.  The Peykars subsequently retained new counsel.

On February 11, 2011, a week before the new trial date, Peykars' *new* counsel, Sean
Stanton, Esq., requested a further adjournment of trial. I held an on-the-record conference call
with the parties, and, after determining that the appearance of the Trustee's trial witnesses could
be rescheduled with minimal prejudice, I granted still another adjournment, rescheduling trial for
March 17 and 18, 2011.

On March 14, 2011, the Peykars' new counsel Stanton filed a letter request for
"Emergency Injunctive Relief," with Judge Koeltl of the district court, which sought to withdraw
the reference and "to stay all proceedings in that bankruptcy pending the same." The next day,
March 15, Judge Koeltl denied that request by endorsed order.[3]

The same day, March 15 (now, two days before the trial), Mitch, presumably acting *pro
se*, filed two additional requests for a stay, both, in substance, for a stay "pending final
determination whether this debtor is properly before the court," and whether this Court (*i.e.*, the
Bankruptcy Court) had jurisdiction over the adversary case.[4] Each was denied by Judge Koeltl,
by endorsed order.[5]

### 2. Trial Day 1 – March 17, 2011

Before trial, I received direct testimony affidavits from the plaintiff side—Trustee's
witnesses Doran Meents and Lester Meents—and from the defendants side—Mitch and Mehran.

The trial began on Thursday, March 17 with the defense's cross-examination of Doran
Meents. Mitch and Mehran were in attendance during all of the proceedings that day. Doran
Meents' testimony concluded late in the day of March 17, at which time the trial was continued

---

[3]   Case No. 1:11-CV-01130-JGK, ECF #4 (S.D.N.Y. Mar. 15, 2011) ("Application to Withdraw the
      Reference is denied.").

[4]   *Id.*, ECF #5 (S.D.N.Y. Mar. 31, 2011); *Id.*, ECF #6 (S.D.N.Y. Mar. 16, 2011).

[5]   *Id.*, ECF #5 ("Application denied. There is no showing of the requirements for emergency injunctive
      relief."); *Id.*, ECF #6 ("Application denied. The papers are plainly insufficient to warrant the relief
      sought.").

to the next day, Friday, March 18.  Before we adjourned for the day on Thursday, I announced

that on the following day, I would hear the cross-examination and any redirect of Lester Meents,[6]

and, immediately thereafter, the cross-examination and any redirect of Mitch and Mehran.

*3.  Trial Day 2 – March 18, 2011*

While each of Mitch Peykar and Mehran sat through the first day of the trial, both failed

to appear in court on March 18, the second day of the trial, when they were supposed to be cross-

examined.  The second day of trial began according to schedule, with the questioning of Lester

Meents.[7]  By the time that questioning ended, the Peykars still had not arrived at court.  At that

time, their counsel Mr. Stanton informed me that he had had discussions with his clients the

night before about the need to cross-examine Lester Meents, and that he had received text

messages from each of the Peykars at 7:30 a.m. that morning instructing him not to cross-

examine Lester Meents.  He made no reference to any other communications with his clients—or

most significantly, any mention that Mitch was ill.

Mr. Stanton further stated that he tried calling both of his clients, but said that their

phones were both going directly to voicemail.  He also stated "I have no explanation for why

they're not here.  They certainly told me that they were coming."[8]

Since there remained no other testimony to be heard or evidence to be introduced other

than the cross-examination of the Peykars, I took a recess until 12:00 noon to give them

additional time to show up.   By noon, the Peykars had not appeared.

When we reconvened at noon, Mr. Stanton stated that despite various efforts to reach his

clients, he had still not heard from them.  Upon hearing that, counsel for the Chapter 7 Trustee

---

[6]    This was to be done by previously arranged video questioning, as he was in South Africa.

[7]    The Defendants waived their right to cross-examine Lester Meents.  However, Mr. Meents was still
       questioned to authenticate documents.

[8]    3/18/11 Hrg. Tr. at 15.

moved to strike the direct testimony of Mitch and Mehran (previously tendered in the form of

affidavit) from the record.

After giving both sides an opportunity to be heard on the issue, I granted the Trustee's

motion to strike.  In that ruling, I stated:

> Mr. Stanton, this isn't aimed at you personally because so far as I
> can tell you've tried to act responsibly.  But while I'm speaking
> very, very softly and very, very quietly, I need to tell both sides
> that this is the last straw with the Peykars.

I went on to say that:

> I am granting the motion to strike the two declarations for inability
> to subject themselves to cross-examination.  I said "inability," I
> mean my inability.  I don't know if it's their inability or their
> unwillingness to be subjected to cross examination.

I continued:

> Under the assumption that this was going to be a regular trial I was
> going to direct both sides to give me post trial briefs and I'm still
> going to do that at a time mutually satisfactory to you but they are
> going to be based of course on the evidentiary record as it's been
> presented to me which does not include the declarations which
> were not subjected to cross-examination, because you can't
> consider testimony without the opportunity to cross examine.

I further stated, however:

> If within one week of today I get both statements under oath by
> each of the Peykars explaining why they could not be here for
> cross-examination this morning and in addition, and I emphasize in
> addition, why they could not communicate with the court or with
> Mr. Stanton and if I consider that it was excusable neglect, I will
> consider giving them another opportunity to be cross-examined but
> frankly, gentlemen, it's going to have to be a pretty strong showing
> because we've gone to the well too many times.[9]

---

[9]     3/18/11 Hrg. Tr. at 221-22 (transcription errors, principally in punctuation, corrected).

*4. The Excuse Affidavits*

Thereafter, on Friday, March 25, 2011, the last day permitted under my oral ruling, the

Peykars' counsel submitted affidavits from Mitch and Mehran explaining their absence from

court on March 18, 2011, requesting that I vacate my decision striking their earlier direct

testimony affidavits, and that I "reschedule the trial to permit my cross-examination dismiss

[*sic.*]."[10]

In his affidavit, Mitch asserted that:

> The first day of trial Thursday February 17, 2011 [*sic.* with respect
> to lack of punctuation and the date, which was actually *March* 17,
> 2011], was particularly stressful, witnessing several hours of cross-
> examination of Doran Meents, our former friend who betrayed us
> by this case.  The next day, we faced our own cross-examination.
> Given that Plaintiffs had secretly taped our phone conversations
> with them and used them in this case, it was unclear where this
> would lead.[11]

He continued:

> That night, I did not sleep at all and my gout condition flared.  I
> took both strong pain and gout medication.  I sent several emails
> during the night to my attorney, and spoke to my brother on the
> phone.[12]

Mitch then stated that in the morning, his brother Mehran came with his car to pick him

up at his home, as previously arranged, to be in court at approximately 9:30 a.m.  But:

> I was feeling terrible, with pain and tightness in my chest, myt
> [*sic.*] heartbeat racing, pounding in my head, and shortness of
> breath.  I believed I was actually having a heart attack and was
> going to die.[13]

---

[10]    Mitch Peykar Aff. in "Wherefore" paragraph at 4; *accord* Mehran Peykar Aff. at 4 (reading identically,
with same error).

[11]    Mitch Peykar Aff. ¶ 5.

[12]    *Id.* ¶ 6.

[13]    *Id.* ¶ 7.

Mitch said that he had his brother Mehran take him (from his home in Flushing, Queens) to his cardiologist, Dr. Steven Shayani, in Mineola, New York, and that Dr. Shayani determined that Mitch did not suffer a heart attack, but was suffering from stress and exhaustion. Mitch said he was "released from his facility about 2 PM and went home to bed."[14]

Mitch also stated in his affidavit that:

> I did not telephone the Court or my counsel on that morning, as during that time as [*sic.*] I was incapacitated by my conditions and unable to call…. My phone was in my overcoat pocket, and which I had left in Mehran's car when I entered the cardiology facility.[15]

Mitch stated further:

> I was not cogent or clear-thinking during this medical situation, and the medical staff at Dr. Shayani's offices instructed me not to make calls which would only further stress me.[16]

Mehran's affidavit was to the same effect (even to the point of repeating aspects of it verbatim, with the same errors), though of course referring to the circumstances as affecting his brother. Mehran added a few additional facts, including that his brother Mitch "called and texted me repeatedly through the night"[17] and that Mitch "was pale, trembling and sweating," and "looked terrible."[18] Mehran stated in his affidavit that Mitch "said he was having a heart attack and was going to die, and I believed him."[19]

Mehran further stated that:

> Mitch demanded I take him to his cardiologist Dr. Shayani's offices in Mineola, NY, and he said a hospital was too far, too

---

[14]   *Id.*

[15]   *Id.* ¶ 9.

[16]   *Id.*

[17]   Mehran Peykar Aff. ¶ 4.

[18]   *Id.* ¶ 5.

[19]   *Id.*

crowded and his doctor's offices had all needed machinery, etc. which it did.[20]

Mehran said further that "I stayed with him at all times."[21]

Mehran explained his failure to call either his lawyer or the Court (when he was not the one who had allegedly become ill) by saying:

> I did not telephone the Court or my counsel on that morning, as during that time I was distracted by my brother's illness and distress…. I had placed my phone in my overcoat pocket, and both Mitch and I had taken off our coats and left them in my car when we entered the cardiology facility. The medical staff at Dr. Shayani's offices instructed me not to make calls which would only further stress my brother, who was conscious but in distress.[22]

Attached to the affidavits was a letter from Shayani stating:

> This is to verify that Mr. Mitch Peykar is a patient of our office. He was under my care on 3/18/2011 due to his medical condition. He was advised to avoid any stress and any physical activity and was told to bed rest for 3-4 days. He was in our office for re-evaluation on 3/23/2011 and 3/24/2011 [sic] would require to follow up in 1 week.[23]

Shayani's letter was unsworn, and he did not submit an affidavit nor any medical records in connection with the statements in his letter.[24]

In light of these affidavits and submissions, and issues of fact that became apparent after counsel for the Trustee responded to them, I issued an order scheduling an evidentiary hearing as

---

[20]  *Id.* ¶ 6.

[21]  *Id.*

[22]  *Id.* ¶ 8. The member of the "medical staff at Dr. Shayani's office" who had allegedly instructed Mehran "not to make calls" was not identified.

[23]  Peykar Affs., Exhibit A.

[24]  The Peykars also submitted a document, entirely in Hebrew, containing both typewritten and handwritten text, with a purported (but non-certified) translation attached. *See* Peykar Affs., Exhibit B. According to the translation, the typewritten document was a request from Mehran to the Tel Aviv Criminal Justice Department for an official confirmation of the dismissal of criminal charges against him (which had related to diamond transactions with the Debtor), and the handwritten note on top stated "I confirm that the file was dismissed and the reason is innocence of the suspect. S/ Daphne Lbnish, Prosecutor, Justice Department." At the risk of stating the obvious, this had nothing to do with Mitch's medical condition, the Peykars' failure to appear, nor the failure of either Mitch or Mehran to explain the failure to call the Court.

to the explanations proffered by Mitch and Mehran Peykar for April 5, 2011, and ordering Mitch

and Mehran Peykar to appear at that hearing for cross-examination on their proffered

explanations.[25]

### 5.  The March 18 Filings

Amongst the evidence that was presented to me for consideration at the evidentiary

hearing were two documents (the "**March 18 Documents**"), prepared by Mitch, that were both

dated Friday, March 18, the same day upon which Mitch was supposed to be cross-examined and

had failed to appear.  Each of the March 18 Documents was prepared and signed by Mitch

personally, acting independently of his counsel.[26]

The first (preceded by "[i]n continuance of the cross examination of Doran Meents"),

filed in this adversary proceeding, was an objection to my questioning of Doran Meents, under

Fed. R. Evid. 614, the day before, and to my making any Findings of Fact and Conclusions of

Law based on that questioning.  The submission was "Dated March 18, 2011"—*i.e.*, the date

Mitch was supposed to be testifying on cross-examination, and the day Mitch said he could not

appear in court or call.

Mitch's filing stated, among other things:

> We respectfully submit that *in yesterday's first day in Trial,* Your
> Honor created an appearance of impropriety, bias, and heavy
> prejudice towards the Peykars.[27]

The second document, also dated March 18, was filed in Fine Diamonds' main chapter 7

case.[28]  This filing was designated as an "Amended Notice of Appeal, Designation of Record,

---

[25]    Adv. Pro. No. 09-1033, ECF #80 (Bankr. S.D.N.Y. Mar. 30, 2011).

[26]    *See* 4/5/11 Hrg. Tr. at 37-39.  Both documents were signed by Mitch, rather than by the Peykars' attorney.

[27]    Trustee's Exh. 4, Adv. Pro. No. 09-1033, ECF #77 (Bankr. S.D.N.Y. Mar. 21, 2011) (emphasis added).  It
shows the stamp of a machine on the fifth floor of the Bankruptcy Court, where the Court takes filings from
the public, of March 21, 2011 at 1:33 p.m., and was posted on ECF that day by a member of the
Bankruptcy Clerk's staff, as contrasted to by a lawyer or anyone else.

Statement of Issue [*sic.*] from Bankruptcy Judge Robert Gerber's Order signed March 15, 2011"

(which had entered the Order for Relief in Fine Diamonds' involuntary chapter 7 case).  It

amended, in major respects, an earlier Notice of Appeal, dated March 15, 2011, which likewise

had been filed by Mitch Peykar, *pro se*.[29]

Neither document made any reference to Mitch's alleged medical condition.

I find that although the March 18 Documents were filed on the following Monday, March

21, each was prepared on the date it bears—Friday, March 18, the day upon which Mitch and

Mehran were to be cross-examined.

*6.  Evidentiary Hearing Subpoenas*

On March 30, 2011, in preparation for the evidentiary hearing concerning the Peykars'

failure to appear, three subpoenas were issued at the request of the chapter 7 Trustee:

(1) requiring *Mitch* to produce:

(a) all medical records relating to any advice or treatment received on

March 18, 2011;

(b) cell phone records of his calls or text messages between 5 p.m. on

March 17, 2011 and 5 p.m. on March 18, 2011, and

---

[28]    *See* Trustee's Exh. 5, Case No. 09-10492, ECF #134 (Bankr. S.D.N.Y. Mar. 21, 2011).  It too was posted on ECF on Monday, March 21 by a member of the Clerk's Office staff.  It also was time stamped, with a time two minutes before the other Mitch Peykar filing, just described.

[29]    Case No. 09-10492, ECF #128 (Bankr. S.D.N.Y. Mar. 16, 2011).  It was file stamped March 16, 2011 (the day before the commencement of the trial), at 4:51 p.m., and posted on ECF on that day, again by a member of the Clerk's Office staff.

(c) copies of any email exchanged between Mehran Peykar, Mitch Peykar, and Eliezer Miller[30] concerning this adversary proceeding or Mitch's health during the same period;[31]

(2) requiring *Mehran* to produce the same documents;[32] and

(3) requiring *Shayani* to:

(a) appear at the evidentiary hearing, and

(b) produce copies of any documents concerning the medical examination, treatment, or advice given to Mitch on the date Mitch was to be cross-examined.[33]

The Peykars did not subpoena Shayani, nor otherwise arrange for his attendance.

*7.  The Evidentiary Hearing*

The evidentiary hearing on the Peykars' motion to vacate my earlier determination took place on April 5, 2011.  The Peykars were cross-examined by counsel for the Chapter 7 Trustee, and subsequently questioned by their counsel and by the Court.

Despite the subpoena requiring his presence, Shayani failed to appear for the evidentiary hearing.  Nor did Shayani produce the subpoenaed documents.[34]  Mitch Peykar did not produce any subpoenaed medical records at the hearing either, and to the Court's knowledge, none have since been produced.

---

[30]    Eliezer Miller is a non-attorney spiritual advisor to the Peykars, or at least to Mitch.  *See* Hrg. Tr. 15.  Other than the fact that there was no contention that communications with Eliezer Miller would be privileged, Miller's exact role is immaterial to the Peykars' motion or my decision here.

[31]    *See* Trustee's Exh. 1.

[32]    *See* Trustee's Exh. 6.  The subpoena issued to Mehran required him only to produce medical records relating to Mitch's medical treatment on March 18, and only to the extent any such records were in Mehran's possession, custody, or control.

[33]    *See* Trustee's Exh. 7.

[34]    The Peykars' counsel Stanton stated that at the hearing that he had spoken with Shayani the day before, and that Shayani had offered to appear by "phone conference" and to fax the subpoenaed medical records to Stanton.  As of the hearing, Stanton had not received any medical records from Shayani.  *See* 4/5/11 Hrg. Tr. at 70.

Mitch Peykar produced his phone bill from the prior month, which showed his text messages and phone calls between January 29, 2011 and February 28, 2011.[35]  He also produced a printout from his carrier's website listing all calls and text messages placed between March 28 and April 4, 2011.[36]  Mitch stated that he went online to get this print out the night before the April 5 hearing, but couldn't figure out how to view internet records of his phone calls and text messages from before March 28.  He said further, however, that he didn't call his carrier or make any requests from his carrier for that information.[37]  No records of Mitch Peykar's phone calls and text messages from the period requested (March 17 and 18, 2011) were produced at the hearing.  To the Court's knowledge, phone records for those dates at issue have still not been produced.

Mehran did not produce any documents.  He testified at the hearing that he wasn't in possession of any documents related to his brother's medical treatment; that he didn't produce e-mails between himself and Mr. Stanton from March 17 or 18 because they were all "confidential,"[38] and that he didn't make any attempt to obtain cell phone records for March 17 and 18 because he uses a prepaid cell phone, which, in his experience, doesn't provide phone records.[39]

---

[35]  *See* Trustee's Exh. 2.

[36]  *See* Trustee's Exh. 3.

[37]  *See* 4/5/11 Hrg. Tr. at 33-34.

[38]  *Id.* at 53.  According to Mehran, he had "[a]t least ten" e-mails between 5 p.m. on March 17 and 5 p.m. on March 18 with Stanton, *id.*, none of which were produced.

[39]  *See* 4/5/11 Hrg. Tr. at 52-53.

Mehran further testified that he did not know of any medical difficulties on Mitch's part before Mehran arrived at Mitch's home to go to court. Mitch did not call Mehran before Mehran's arrival.[40] In fact, they started to drive to court, not to a hospital or to Shayani's.[41]

Mehran further testified that after he took his brother into an examining room and helped Mitch take off his clothing, that he then had to step out, and that he waited outside the examining room, for "a few hours"[42]—a period that ran until after 2:00 p.m.[43]

Each of Mitch and Mehran said that they did not tell Mitch's wife of Mitch's alleged medical distress. They explained that she had high blood pressure, and that they didn't want to cause her stress.[44]

*8. Factual Conclusions*

For reasons set forth below, I don't believe the Peykars' story. Even if (though I doubt it) the Peykars had gone to Shayani's office, the excuses for the failure to call are even less believable. I find as facts that Mitch and Mehran did not want to be cross examined, as they were fearful of the outcome;[45] that Mitch spent March 18, the Friday on which he was to testify, working on the March 18 Documents, dated that day, to bolster a collateral attack on what he feared would be the outcome of the trial; that if Mitch and Mehran went to Shayani's office at all (again, which I doubt), it was not under the circumstances that they described; and that neither

---

[40]    *Id.* at 56.

[41]    *Id.* at 57 ("I started driving. I was actually driving towards the court and then I saw that he wasn't doing so well. He was all pale and sweating and we decided that we're going to go to the doctor instead.")

[42]    *Id.* at 61-62.

[43]    *Id.*

[44]    *Id.* at 24-25 (Mitch); 59 (Mehran).

[45]    Aside from the evidence of such from the surrounding circumstances, Mitch admitted as much. *See* Mitch Peykar Aff. ¶ 5 ("The next day, we faced our own cross-examination. Given that Plaintiffs had secretly taped our phone conversations with them and used them in this case, it was unclear where this would lead").

(and especially Mehran) had any excuse for the failure to contact the Court (or at least their

counsel) that day with respect to their failure to appear.

The reasons for these factual conclusions, and the bases for the exercise of my discretion

in adhering to my earlier determination, follow.

Bases for the Exercise of My Discretion

While I assume that I have discretion to vacate my earlier order upon a satisfactory

explanation and showing of excusable neglect, here I have neither.  I do not believe the Peykars'

story or excuses.  And even if they were telling the truth, or if part of their story (*e.g.*, the part

where they said they actually visited Shayani) were truthful, they failed to provide a credible

explanation for their failure to, at the very least, notify either the Court or their counsel on March

18, the day that they were due in court.  Thus my earlier decision stands.

*A.  Disbelief of the Peykars' Story*

Initially, I don't believe the Peykars' story, or, especially, their excuses, and do not find

either the story or the excuses credible in any way.

*(1) Lack of Corroboration*

First, there was no admissible evidence whatever corroborating the Peykars' testimony

that they went to Shayani's office on March 18.  Shayani ignored the Trustee's subpoena (with

the Peykars not having subpoenaed him, or otherwise arranged for his attendance), and Shayani's

unsworn letter is not evidence.  It is inadmissible hearsay.  The letter from Shayani (aside from

being inadmissible) did not describe when Mitch Peykar got to his office and what Shayani

discovered.  Nor did it describe who at Shayani's office (it evidently not having been Shayani

himself) told each of Mitch Peykar and Mehran Peykar that he shouldn't make a phone call.[46]

---

[46]        *See* Mitch Peykar Aff. ¶ 9; Mehran Peykar Aff. ¶ 8.

And despite the subpoena (which ironically came from the other side), Shayani did not show up at the April 5 hearing or produce any documents, which, unlike his letter, might have been admissible.  If Shayani had in fact treated Mitch Peykar on the day Mitch claimed to have gone there, and if in fact any ailment on Mitch's part impaired Mitch's ability to testify, it would have been easy for Shayani to comply with the subpoena, or even to testify without one.  The failure of Shayani to corroborate Mitch's account under oath speaks volumes.

*(2) Explanations Not Believable*

Second, the Peykars' explanation of the circumstances of March 18 is simply not believable.  Mitch's accounts varied from question to question.  At one point, Mitch said that he didn't ask his doctor for copies of his medical records from March 18 because "I just want to have my doctor and patient privacy."[47]  Just a few moments therafter, he then said, with respect to the reason for not providing medical records, "There's not particular reason.  I had told the doctor."[48]  Then, he said he didn't ask his doctor for the records because "He [Shayani] was a subpoenaed individual."[49]  Mitch's medical records for that day were subpoenaed, and Mitch effectively ignored his subpoena, complying with it only somewhat more than Shayani did.  If there had in fact been the trip to Shayani, and if Mitch's medical condition impaired his ability to testify, that could have easily been documented by producing the medical records.  The failure to produce them once more speaks volumes.[50]

---

[47]    4/5/11 Hrg. Tr. at 5.

[48]    *Id.* at 6.

[49]    *Id.*

[50]    It is possible, I suppose, that Mitch could have made the trip to Shayani's office, but that he exaggerated the medical circumstances, accounting for the failure to produce the underlying medical records.  I regard this as unlikely, by reason of the other surrounding evidence, discussed above and below.  But if it were in fact the case, it would of course mean that there was less of an impairment in testifying, or, especially, in advising the Peykars' counsel and the Court on March 18.

Likewise, Mehran's story that one or more unnamed "medical staff at Dr. Shayani's office" "instructed me not to make calls" further insults my intelligence. Aside from the vagueness and the fact that the "medical staff" was never named (or called to testify), the stated reason for the instruction not to make calls—that "calls [] would only further stress my brother"[51]—is nonsensical. If Mehran's story is otherwise to be believed, he was by himself, for hours on end, outside of the examining room where Mitch had gone.[52]

Moreover, Mehran's account in his affidavit is inconsistent with his testimony at the evidentiary hearing. At the hearing, Mehran's account was not that he was told not to make the call, but in substance that he forgot:

> Q.    Did you ever attempt to call your lawyer, Mr. Stanton, during the entire time that you were waiting for Mitch in the doctor's office?
>
> A.    Well, I only realized few [*sic.*] hours later after this whole—this whole thing that was going on…. [53]

Mehran continued with an account that it was a warm day, that "we took out our overcoat" and that his phone was left in the car together with the overcoat, and that "I didn't even [have] my phone with me if I wanted to make a call."[54]

*(3) Failures to Produce Phone Records*

Third, Mitch easily could have substantiated his communications on March 17 and March 18 by producing relevant phone records. Mitch failed to do so, even though, like the medical records, they'd been subpoenaed. Once more, the subpoena was effectively ignored. The phone records Mitch produced covered wholly irrelevant dates, and no records were produced for the

---

[51]    Mehran Peykar Aff. ¶ 8.

[52]    4/5/11 Hrg. Tr. at 61.

[53]    *Id*. at 62.

[54]    *Id.*

two days in question, March 17 and 18, 2011.  Mitch did not call or otherwise contact his phone

carrier before the hearing to request the records for the relevant dates.  Moreover, there is no

valid reason why the phone records for March 17 and 18 have not since been produced, given

that Mitch could have requested them from his carrier after the hearing (if not also before that

time, and if not also by simply checking the carrier's website), and that Mitch would have

received his bill for March weeks ago.

### (4) Bypassing Nearby Hospitals

Fourth, the Court was told that Mitch Peykar thought he was dying, but instead of

traveling to the emergency rooms of three hospitals that were very close (with two of them, New

York Hospital, only 1.1 miles from his home and one, Long Island Jewish Hospital, only

1.3 miles from his home), he elected to go from Queens to a cardiologist in Mineola, Long

Island, 13 miles, and 20-30 minutes, away.  If, in fact, Mitch's condition was a serious as

claimed, it strains credulity that he would not have called an ambulance or gone to one of the two

hospitals only a mile away.  And if the Peykars are to be believed, before traveling all the way to

Mineola, neither Mitch nor Mehran called Shayani's office to see whether Shayani was even in

the office that day, or what they should do.[55]

### (5) Messages to Stanton at Nearly Same Time

Fifth, Mitch asserted that on the night of March 17 "I did not sleep at all and my gout

condition flared,"[56] and that on the morning of March 18, he thought he was dying.  But only

half an hour or 45 minutes before he said he left for Shayani's office, Mitch sent a text message

to his lawyer Stanton telling Stanton not to cross-examine Lester Meents, without any mention of

thinking he was dying (or any other mention of his medical condition), or his inability to come to

---

[55]       *See* 4/5/11 Hrg. Tr. at 25, 60.

[56]       Mitch Peykar Aff. ¶ 6.

court. I believe that Stanton told me the truth when Stanton said that Mitch had text messaged him at 7:30 a.m., without mention of Mitch's medical condition. The notion that Mitch thought he was dying and could not go to court, while sending a message, so close in time, that made no mention of dying, of inability to come to court, of having been up all night, or of any of the other aspects of his story, once more strains credulity.

### (6) The March 18 Documents

Sixth, the March 18 Documents raise doubts as to the severity of Mitch's infirmity, and, even more clearly, Mitch's inability to contact his attorney. They instead provide an alternative explanation as to what Mitch was doing that day. Mitch testified at the evidentiary hearing that although he wrote the date March 18 on the two submissions, he actually drafted them both on the night of the 17th, and stayed up that entire night working on them.[57] But the documents were both dated March 18, and one specifically stated "in yesterday's first day in Trial." They do not strike me as the kinds of documents that could have been written in the middle of the night, especially by one who was as distraught by what he heard on the first day of trial, and who had serious concerns as to what would happen on the next day. I conclude that they were written exactly when they say they were—on March 18, 2011, when Mitch Peykar was supposed to be under cross-examination.

### B. No Excuse for Failure to Advise Court

Additionally, even if I were to regard the Peykars' account as truthful, which I do not, the failure to contact the Court or their counsel, Mr. Stanton, remains unexplained. Even if Mitch were in fact incapacitated and unable to contact the Court or his attorney, Mehran was not. Mehran provided no credible reason, much less any persuasive one, for his failure to do so. Both

---

[57]    4/5/11 Hrg. Tr. at 37-38.

Mitch and Mehran knew that they were supposed to be in court on the 18th,[58] ready to testify. They must have known their attorney and the Court would be wondering where they were. If the Peykars are to be believed, they were at cardiologist for nearly 5 hours. Mehran was sitting around throughout that time. If the Peykars are to be believed, during that entire time, while Mehran was waiting for Mitch for hours on end, Mehran never went to the car to get his phone to try to call or text their attorney. Furthermore, Mitch and Mehran Peykar testified that they left the Mineola doctor's office at about 2:00 p.m. And Mehran testified that after he got home from dropping of his brother, he checked his phone messages around 4 or 5 p.m., at which time he listened to a message from Mr. Stanton, in which Mr. Stanton "did sound very upset."[59]  Yet Mehran never explained why, even if Mitch could not make a phone call upon his return, he couldn't or didn't make such a call either, especially after having received a voicemail from Mr. Stanton.

### C. No Change in Ruling

In advocating the Peykars' position in argument on the motion, the Peykars' counsel was hamstrung in arguing client accounts that tested my credulity. With no corroboration for his clients' accounts, he understandably made no reference to any extrinsic evidence that would corroborate their story. And once more understandably, he made no effort to explain why his clients—and especially Mehran—could not contact him or the Court on that day. Instead he noted that his clients were being sued for $37 million.[60]  And he observed that striking their

---

[58]    During their cross-examination, both Mitch and Mehran Peykar suggested that they didn't know whether they would in fact be cross-examined on Friday, March 18. *See* 4/5/11 Hrg. Tr. at 16, 54. But the Peykars knew that Lester Meents was the only other witness who still hadn't been cross-examined, and the Peykars made the decision on the morning of the 18th not to cross-examine him; therefore, they had to know that they would be taking the stand on the 18th.

[59]    4/5/11 Hrg. Tr. at 65.

[60]    *Id.* at 79.

direct testimony would greatly increase the chances that his clients would lose.[61]  No doubt the latter two points are true.  But while these points would weigh heavily on me if I didn't think I was being lied to, they are not a substitute for a truthful account of what happened, and provide no satisfactory explanation for what was in substance a knowing default.

I stated in my ruling on March 18 that the Peykars would have to provide an explanation as to why they could not appear in court, *and* why they could not communicate with the Court or with Mr. Stanton on that day.  The Peykars did neither.  Their explanations were not believable.  And they have not shown excusable neglect.  Even if I believed everything that Mitch and Mehran Peykar said, it still wouldn't explain Mehran's failure to call the Peykars' counsel Stanton or the Court on Friday, March 18.

My ruling stands.

Dated: New York, New York             *s/Robert E. Gerber*
      June 14, 2011                              United States Bankruptcy Judge

---

[61]      *Id.*