UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) Chapter 7 Case |
| FINE DIAMONDS, LLC | ) No. 09-10492 (REG) |
| Debtor. | ) |
| | ) |
| GREGORY MESSER, as Chapter 7 Trustee | ) |
| of Fine Diamonds, LLC, | ) |
| | ) |
| Plaintiff, | ) Adversary Proceeding |
| v. | ) No. 09-01033 (REG) |
| | ) |
| PEYKAR INTERNATIONAL CO., INC., MITCH PEYKAR | ) |
| and MEHRAN PEYKAR, | ) |
| Defendants. | ) |
| | ) |

DECISION AFTER TRIAL

APPEARANCES:

**WILK AUSLANDER LLP**
*Counsel for Plaintiff Gregory Messer, Chapter 7 Trustee*
1515 Broadway, 43rd Floor
New York, New York 10036
By:     Eric J. Snyder, Esq.
           Alan D. Zuckerbrod, Esq.

**SEAN E. STANTON, ESQ.**[1]
*Counsel for Defendants Peykar Intl.,*
  *Mitch Peykar, & Mehran Peykar*
1799 Lexington Avenue
New York, New York 10029
By:     Sean E. Stanton, Esq.

---

[1]     After trial and submission of the Defendants' Post-Trial Brief, Mr. Stanton asked to be relieved from his representation of the Defendants.  *See* ECF # 102.  His request was granted.  *See* ECF # 103.

ROBERT E. GERBER
UNITED STATES BANKRUPTCY JUDGE:

Introduction

In this adversary proceeding under the umbrella of the chapter 11 case of Fine Diamonds LLC ("**Fine Diamonds**"), chapter 7 Trustee Gregory Messer (the "**Trustee**"), pursuant to section 542 of the Bankruptcy Code, seeks the return (or a cash judgment for the value) of diamonds worth more than $37 million that had been entrusted to Defendant Peykar International Co. ("**Peykar International**")—pursuant to a consignment agreement negotiated with (and implemented by) Peykar International's principals, Defendants Mitch Peykar ("**Mitch**"), and Mehran Peykar ("**Mehran**," and together with Mitch, "**the Peykars**").[2]

Along with that federal turnover claim, the Trustee seeks the value of those diamonds under three other legal doctrines:

- (as against Peykar International), two of the Bankruptcy Code's fraudulent transfer provisions, sections 544 and 548;

- (as against each of Peykar International, Mitch and Mehran), state law conversion; and

- (as against Mitch and Mehran), fraudulent misrepresentation.

After trial, the Court finds that the diamonds were indeed consigned to Peykar International, and neither returned nor paid for. Turnover, or its equivalent, is plainly required. The Court further finds that Defendant Peykar International is liable to the Trustee as the transferee of a fraudulent transfer, and that each of the Defendants Peykar International, Mitch

---

[2] In this decision, Mitch and Mehran Peykar (like Doran, Jeffrey and Lester Meets, referred to below) are referred to by their first names for the purpose of distinguishing them.

and Mehran, jointly and severally, is liable to the Trustee for conversion. But the Court finds

that the Trustee failed to establish his claim for fraudulent misrepresentation.

The Court has no reason to believe that the diamonds can be returned in kind. Judgment

should be entered[3] against Defendant Peykar International for their value (shown to be

$37,593,930.34), on the turnover, fraudulent transfer and conversion claims. Mitch and Mehran

should be liable, jointly and severally with Peykar International, on the conversion claim.

The Court's Findings of Fact (or, with respect to the state law claims, proposed Findings

of Fact) and Conclusions of Law follow.

---

[3]     The Court plainly has the constitutional power to enter a final judgment on the section 542 turnover claim, for reasons set forth at length in its decision in *Geron v. Peebler (In re Pali Holdings, Inc.)*, 488 B.R. 841, 848–53 (Bankr. S.D.N.Y. 2013). And though the cases are split, the Court believes that it likewise has that power with respect to the federal fraudulent transfer claims here, for reasons explained in Judge Drain's decision in *Kirschner v. Agoglia (In re Refco Inc.)*, 461 B.R. 181, 183–94 (Bankr. S.D.N.Y. 2011) ("*Refco*"), and later decisions following *Refco*, such as *Feuerbacher v. Moser*, 2012 U.S. Dist. LEXIS 44396, at *17, 2012 WL 1070138, at *7 (E.D. Tex. Mar. 29, 2012) (Crone, J.), and *Fox v. Koplik (In re Perry H. Koplik & Sons, Inc.)*, 476 B.R. 746, 755 (Bankr. S.D.N.Y. 2012) (Gerber, J.) ("***Koplik-Bankruptcy***"), *objections to proposed factual findings overruled but with adjustments in factual findings made*, --- B.R. ---, 2013 U.S. Dist. LEXIS 123254, 2013 WL 4534811 (S.D.N.Y. Aug. 14, 2013) ("***Koplik-District***") (Castel, J.). Of course, the state law conversion and fraudulent misrepresentation claims here are of a type with respect to which this Court cannot (and even before *Stern v. Marshall*, could not) enter a final judgment.

In *Koplik-Bankruptcy*, this Court was faced with a similar situation, where it concluded that it could constitutionally enter judgment with respect to some, but less than all, of the claims then before it. There, as here, the claims with respect to which a bankruptcy judge could enter a final judgment, and those with respect to which it could not do so, were respect to the same loss. For that reason, in *Koplik-Bankruptcy*, this Court deferred entry of judgment on the claims with respect to which it could constitutionally enter judgment, pending determination of the remainder of the case by the district court. *See* 476 B.R. at 755 n.7. In *Koplik-District*, Judge Castel, after overruling all of the objections to the bankruptcy court proposed findings of fact (and after adopting the proposed factual findings subject to adjustments as set forth in two footnotes to his decision), and without needing to decide (and thus without deciding) whether bankruptcy judges can enter final judgments on fraudulent transfer claims, entered judgment on all of the claims. *See* --- B.R. ---, 2013 Bankr. LEXIS 123254, at *87, 2013 WL 4534811, at *30.

Here, as in *Koplik-Bankruptcy*, the Court is deferring entry of judgment on the claims with respect to which it has the constitutional power to enter final judgment, to permit district court review similar to that engaged in by Judge Castel in *Koplik-District*. And as in *Koplik-Bankruptcy*, *see* 476 B.R. at 755 n.6, the Court's conclusions should simply be deemed to be *proposed* with respect to any matters as to which an Article I bankruptcy judge is not constitutionally empowered to issue a final judgment.

<u>Findings of Fact</u>[4]

*1. Background*

Fine Diamonds was established as a New York limited liability company in 2003. Doran

Meents ("**Doran**") was the sole employee of Fine Diamonds during the years 2003 through

2008. The Meents family had a long history of involvement in the diamond industry. Doran

Meents' grandfather, Louis Meents, started Festdiam Diamond Cutting Works ("**Festdiam**"), a

South African privately held company, in the early 1960s. Festdiam became a "sightholder" of

DeBeers, the largest supplier of diamonds in the world, which enabled Festdiam to source and

purchase rough diamonds from DeBeers in order to meet the demand for polished diamonds

from Festdiam's customers. Doran Meents' father, Jeffrey Meents ("**Jeffrey**"), and Doran's

uncle, Lester Meents ("**Lester**"), joined Festdiam in the 1970s.[5]

In 2003, Jeffrey and Lester established Fine Diamonds in New York, holding 100% of

the equity in the company between them. As Fine Diamonds' sole employee, Doran moved to

New York and began selling diamonds supplied by Festdiam through the new New York-based

company.

Doran first developed a business relationship with Mitch and Mehran (collectively, the

"**Peykars**"), brothers who then owned a company called D&M Gems and Jewels, in or about

2001. The Peykars subsequently established Peykar International, based in New York and then

in Tel Aviv, Israel, as well. Mehran was responsible for the Tel Aviv office.

---

[4]    To avoid lengthening this decision further, the Court limits citations to the most significant matters.
Likewise, to avoid unnecessary repetition, certain facts appear only in connection with the Court's
discussion of legal issues.

[5]    Lester Meents Decl. ("**Lester Decl.**") at ¶¶ 11, 4. Doran Meents Decl. ("**Doran Decl.**") at ¶¶ 1, 3, 6.

### 2. Dealings Between Fine Diamonds and Peykar International

Between 2003 and 2006, Doran's business with the Peykars was limited and involved traditional purchase and sale transactions, with credit extended. At the end of 2006, Mehran approached Doran to ask whether Doran would be willing to work with him in a different manner. Mehran said that he did not want the responsibility of taking on credit and asked if Doran would agree to consign diamonds to him "on memo," as was often done in the diamond business.[6]

Beginning in early 2007, Doran began providing diamonds to the Peykars on consignment. In testimony the Court finds credible and takes as true, Doran testified:

> I would provide Mitch or Mehran with batches of diamonds
> on consignment. Title to the diamonds remained with Fine
> Diamonds, but possession was given to one of the Peykars,
> who would try to solicit sales to customers. Mitch and
> Mehran would in turn indentify [*sic*] customers, negotiate
> and arrange for the sale of the diamonds and remit a
> previously agreed upon price to Fine Diamonds, keeping
> any profit above our negotiated price. . . . In the beginning
> of the relationship in 2007, I recall Mehran signing a few
> "memos" for the receipt of the diamonds. That procedure
> might have lasted for only the first few deliveries.
> Eventually there came a time when the Peykars and I were
> doing so much business and I trusted them unconditionally,
> that I no longer required them to sign a memo.[7]

With the exception of two individual large stones, the Peykars accepted every single diamond Doran offered them.[8]

---

[6]    Doran Decl. at ¶ 9.

[7]    *Id.* at ¶¶ 12, 13.

[8]    Trial Tr. 124:3–6; 153:8–25 (March 17, 2011). *See also* Mitch Dep. Tr. 84:4–6 ("Q. So whatever diamonds he [Doran] brought in a box you would accept? A. Yes."). Batch 39 was originally accepted, but thereafter returned. Trial Tr. 153:22–25.

The diamonds Peykar International received from Fine Diamonds were transferred on a

consignment basis; indeed, Mitch expressly admitted that,[9] and in his answer, Mehran admitted

to the consignment relationship without qualifications.[10]

### 3. The Relationship Between Fine Diamonds and Peykar International Grows

From approximately April 2007 continuing through the end of 2008, virtually all of the

sales and distribution of Fine Diamonds' diamonds flowed through Peykar International and the

---

[9]     As Mitch testified in his deposition:

> Q.  What was your understanding that the relationship [between Fine Diamonds and the Peykars] was?
>
> A.  That he would provide us with stone [*sic*].
>
> Q.  When you say "he"?
>
> A.  Doran Meents.  That Doran Meents would provide us with stone [*sic*] and we have to sell and give him back the money.
>
> Q.  After you made a sale, correct?
>
> A.  That is correct.
>
> Q.  The arrangement was strictly on a consignment basis, is that correct?
>
> A. My understanding, yes.

Mitch Dep. Tr. 71:19–72:7.  Likewise, further testimony by Mitch in his deposition went as follows:

> Q.  [Y]ou didn't buy diamonds from Fine Diamonds, you only bought diamonds on consignment—
>
> A.  That's correct, but I'm going to explain myself to you—
>
> Q.  Let me finish the question.  I believe your testimony was you didn't purchase diamonds from Fine Diamonds, you only purchased diamonds on consignment?
>
> A.  That's correct.

Mitch Dep. Tr. 123:8–17.

[10]     The Amended Complaint alleged:

> Late in 2006, the Debtor, by Doran Meents, and Peykar Co., by Mehran Peykar, entered into a business relationship in Manhattan wherein the Debtor agreed that it would consign diamonds to Peykar Co. for sale to third parties.  Debtor was to receive the proceeds of such sales, less a commission to be paid to Peykar Co.

ECF #28 at ¶ 31.  Mehran admitted this paragraph 31 without any qualifications.  *See* Def. Mehran Peykar Answer to Am. Compl., ECF #33 at ¶ 31.

Peykars.[11]  Peykar International became the principal distributor and broker of diamonds for Fine

Diamonds.[12]  Initially, Doran transferred batches of diamonds worth a few hundred thousand

dollars only, but when the relationship appeared to be working well, Doran began transferring

more and more diamonds to Peykar International, with batches of diamonds valued in the

millions of dollars.[13]  The Peykars would sell the diamonds to customers and remit payment back

to Fine Diamonds.[14]

4.  *Fine Diamonds' Records of Diamonds
   Delivered to Peykar International*

     Fine Diamonds delivered numerous diamonds to Peykar International in the period from

April 1, 2007 through November 2008.  The specifics of the deliveries were documented to the

Court's satisfaction.  They were shown in Plaintiff's Exhibit 1, a binder containing Microsoft

Excel spreadsheets listing all transactions between Fine Diamonds and Peykar International,

which were given to the Peykars at the time they were generated,[15] with respect to which a

foundation was satisfactorily laid to admit them as business records.[16]

     Each of the spreadsheets reflected specific diamonds that Doran delivered to either Mitch

or Mehran, along with the cumulative price for each batch that Peykar International agreed to

pay Fine Diamonds.  The spreadsheets contained line items for each stone, listing the weight (by

carat), color, clarity, and other physical characteristics.[17]  In addition, there was a listing for the

"Rappaport" price (which is a trade publication that lists the values of diamonds), along with a

---

[11]     Doran Decl. at ¶ 10.

[12]     *Id.* at ¶ 11.

[13]     *Id.* at ¶ 10.

[14]     *Id.* at ¶ 12.

[15]     Trial Tr. 83:4–5; 17–24.

[16]     *See* Trial Tr. 121:4–122:7 and testimony preceding that ruling.

[17]     Doran Decl. at ¶ 16.

discount for the particular transaction and a price for each stone that had been agreed upon between Doran and one or both of the Peykars.[18]

Doran made contemporaneous handwritten notes of any payments he received from Peykar International with respect to each batch of the Debtor's diamonds that had been delivered to Mitch or Mehran.[19]  On the bottom right of most of the spreadsheets was a date indicating the date that the spreadsheet was prepared.[20]  The diamonds were delivered to Peykar International on that date or shortly thereafter.[21]

With only one exception, the payments from Peykar International for particular batches of diamonds took place weeks or months after the diamonds were delivered, and after more batches of diamonds were transferred to Peykar International.[22]

The cumulative amount of diamonds consigned to Peykar International, along with the amounts paid on account of earlier consignments, was established to the satisfaction of the Court, as shown in Plaintiff's Exhibit 3, which was admitted, after extensive foundation testimony, at the trial.[23]  It was a chart that Doran prepared using Microsoft Excel that combined the cumulative value of diamonds consigned to, and payments received from, Peykar International, as of early December 2008.[24]  As documented by Plaintiff's Exhibit 3, and as explained by Doran at trial, the outstanding balance as of early December 2008 owed by Peykar International to Fine Diamonds for diamonds consigned to them was $37,593,930.34.[25]  Over the course of the

---

[18]    *Id.*

[19]    *Id.* at ¶ 18; Pl. Exh. 1.

[20]    Doran Decl. at ¶ 17.

[21]    *Id.*

[22]    *Id.* at ¶ 20; Trial Tr. 59:20–22 (March 17, 2011).

[23]    *See* Trial Tr. 121:4–122:7 (March 17, 2011) and testimony preceding that ruling.

[24]    Doran Decl. at ¶ 22.

[25]    *Id.*

relationship, Fine Diamonds transferred over $125 million in diamonds to Peykar International, and received less than $87 million in payments—leaving $37.6 million owed by Peykar International to Fine Diamonds, after accounting for approximately $2 million in returned diamonds.[26]

The Defendants presented no evidence to challenge this amount.  But the Court nevertheless considered it necessary to gauge Doran's credibility.  After having an opportunity to assess Doran's testimony with the benefit of cross-examination, the Court found Doran's testimony to be credible, and had no basis for questioning it.

As a result, the Court finds the outstanding balance—*i.e.*, the value of diamonds not yet returned or paid for by Peykar International—to be $37,593,930.34.[27]

5.  *Fine Diamonds Becomes Concerned
    About Rising Balance*

During the early part of 2008, the amount owed to Fine Diamonds by Peykar International began to increase, eventually exceeding $37 million by the end of the summer.[28]  In September 2008, Doran noticed that the payments from Peykar International were slowing down. Doran expressed his concern on numerous occasions to Mitch and Mehran that the Peykars were holding a large amount of Fine Diamonds' property while the money was coming in at a much slower pace.[29]

---

[26]    Trial Tr. 109:11–17(March 17, 2011); Pl. Exh. 3.  The Defendants admitted as a stipulated fact that "[f]rom 2007 through 2008, Peykar International . . . paid Fine Diamonds between $86,601,642.29 and $88,304,124.00 in exchange for diamonds provided to it by Fine Diamonds."  Joint Pre-Trial Order at ¶ 12.

[27]    The Peykars provided no testimony or other evidence to dispute this amount.

[28]    Doran Decl. at ¶ 28; Pl. Exh. 3.

[29]    Doran Decl. at ¶ 28.

Doran was told by Mitch and Mehran that the diamonds were being kept safely under their control, locked in safes and available at all times either in New York or Tel Aviv.[30]  Mitch and Mehran also represented to Doran that Israeli customers and companies had committed to buy many of the diamonds Fine Diamonds had transferred to them.[31]  Doran spoke with the Peykars during September and October 2008 on an almost daily basis about these matters, and Doran was repeatedly assured of the safety of the diamonds.[32]

On October 11, 2008, Doran sent Mehran an email demanding that Mehran wire money to Fine Diamonds to reduce the outstanding balance, and to help alleviate the pressure Fine Diamonds' suppliers were putting on Fine Diamonds.[33]  Doran specifically requested that payments totaling $5 million be made that week, and that an additional $3 to $4 million be made the following week.[34]  Mehran did not respond to the email.[35]

On October 25, 2008, Doran again emailed Mehran to complain about his failure to make promised payments.[36]  Mehran did not reply in writing to that email either.  But Mehran promised during a subsequent telephone conversation that payments would be made when the

---

[30]    *Id.*

[31]    *Id.* at ¶ 29.

[32]    *Id.* at ¶¶ 28–29.  Doran also testified to this, repeatedly, at trial.  *See* Trial Tr. 109:18–22; 130:8–24; 134:7–13; 136:6–23 (March 17, 2011).

[33]    Doran Decl. at ¶ 30.

[34]    *Id.*

[35]    *Id.*

[36]    In the email, Doran wrote:

> I can't understand that you tell me you have wired money to me and it never arrives to me, all its doing is making my situation a lot worse as I promise this to my family and others and its not happening—I need accurate information for these big numbers. . . . I need you to let me know what exactly is going on here and when I am going to receive money finally. . . . I have committed to all these goods for you and I am getting completely let down. . . . I will call you on Sunday—I have to talk to you to find out what is going on with the goods and I need to have an exact payment plan when I call you, so please work on it in the morning.  Thank you.

(*sic*) Pl. Exh. 7; Doran Decl. at ¶ 31.

-10-

diamonds were sold.[37]  Although Mitch provided some polished diamonds to Doran in October,

no cash payments were ever made.[38]

### 6. *Mitch's Continued Representations*
   *About the Safety of the Diamonds*

During late October 2008, Doran and Mitch met at Mitch's office, and Doran again asked

about the diamonds Peykar International was holding.[39]  Mitch reassured Doran that many of the

diamonds were in sealed "cachets" in Israel.[40]  Mitch stated that between the diamonds in Israel

and the ones he was holding in New York, Peykar International was holding $41 million worth

of Fine Diamonds' diamonds.[41]  While Mitch said that not all of the diamonds that he and his

brother had were Fine Diamonds' diamonds, Mitch said, "thank God I have more diamonds than

what I owe you and that you are safe."[42]

### 7. *Fine Diamonds Experiences Pressure from Suppliers*

Fine Diamonds was under increasing pressure from its suppliers to repay its outstanding

debts, and Doran was under increasing pressure from his family as the stream of payments

coming into Fine Diamonds from the Peykars had slowed dramatically.[43]  Blue Star Diamonds

("**Blue Star**"), one of the Debtor's largest creditors, contacted Lester to convey its concern that

the payments from Fine Diamonds for polished diamonds were not coming in as regularly as

---

[37]     Doran Decl. at ¶ 31.

[38]     *Id.* at ¶ 32.

[39]     *Id.* at ¶ 33.

[40]     *Id.*  Cachets are boxes sealed with tape that are usually signed by a prospective customer and contain the stones and the details of the exact carat, weight, and amount of stones sealed in the boxes, reserved for customers pending payment and/or a decision by the customer whether to go forward with the purchase. Lester Decl. at ¶ 29.

[41]     Doran Decl. at ¶ 33.

[42]     *Id.*

[43]     *Id.* at ¶ 35.

they had been, and that Fine Diamonds was in fact significantly behind in such payments.[44]  In November 2008, Lester became aware of a dramatic drop off in payments from Fine Diamonds to Festdiam, and became increasingly concerned about the viability of Festdiam's business in the United States.[45]

Lester spoke with representatives of Blue Star in late November 2008, at which time the Blue Star representatives advised Lester that Blue Star was willing to take certain diamonds back, and to credit Fine Diamonds for those diamonds.[46]  Accordingly, Doran shipped certain other diamonds to Blue Star to hold as collateral for the ultimate return of Blue Star's diamonds, while Doran continued to pursue payment from the Peykars.[47]

At the same time, the Peykars convinced Doran that they could sell smaller diamonds (in the range of 0.9 to 1.5 carats) more quickly, which in turn would provide needed cash flow to Fine Diamonds.[48]  Relying on these assertions, Doran shipped larger diamonds to Blue Star, and Blue Star shipped 156 smaller stones to Doran.[49]  Doran delivered these diamonds to Mitch's New York office on December 1, 2008.[50]  Doran never received any payments from any subsequent sale of these diamonds, nor did he ever see these diamonds again, despite attempting to retrieve them later.[51]

---

[44]     Lester Decl. at ¶¶ 18–19.

[45]     *Id.* at ¶ 19.

[46]     *Id.*

[47]     Doran Decl. at ¶ 36

[48]     *Id.*

[49]     *Id.*

[50]     *Id.* at ¶ 38.

[51]     *Id.* at ¶ 39.

### 8. *Doran and Lester Confront Mehran in Israel*

On December 2 and 5, 2008, Doran sent Mehran emails asking Mehran to return diamonds that Doran had transferred to Peykar International, so Doran could return them to Fine Diamonds' suppliers and reduce the financial pressure from Fine Diamonds' creditors.[52]

On December 5, 2008, after sending the second email, Doran spoke with Lester, and explained that the Peykars had been repeatedly telling him that most of the diamonds transferred to them by Fine Diamonds were being held in sealed cachets in Israel under Mehran's control, but that Mehran was not responding to requests to return the goods.[53]  Lester asked Doran to meet him in Israel to confront Mehran.[54]

In anticipation of that meeting, Doran sent another email to Mehran that night, attaching his summary spreadsheet indicating the $37,593,930.34 outstanding balance.[55]  Mehran did not respond to that email either.[56]

However, on his way to the airport the next day, Doran received a call from Mehran, attempting to dissuade Doran from coming to Israel by promising to ship Fine Diamonds' diamonds to New York.[57]  Mehran asked that he be given time first, though, to contact the potential customers to inform them that he needed to break open the cachets.[58]  Mehran also claimed to have shipped three batches of diamonds the day before to Doran in New York, worth a total of $6 million.[59]

---

[52]    *Id.* at ¶¶ 40–41; Pl. Exh. 8; Exh. 9.

[53]    Doran Decl. at ¶ 42.

[54]    *Id.*

[55]    *Id.* at ¶ 43; Pl. Exh. 10; Pl. Exh. 3.

[56]    Doran Decl. at ¶ 43.

[57]    *Id.* at ¶ 44.

[58]    *Id.*

[59]    *Id.*

Doran, Lester, and Lester's daughter confronted Mehran on December 7, 2008 at the Tel Aviv Diamond Exchange, where Mehran's office was located.  When they did so, Mehran immediately told them that he was holding $47 million of diamonds.[60]  Mehran then produced a few boxes, trays, and parcels of loose diamonds which he acknowledged belonged to Fine Diamonds, and which he said were being returned as credit for what was owed by the Peykars to Fine Diamonds.[61]  Mehran also claimed that some diamonds had been given to a broker in the United States to sell to customers there.  But Mehran could provide no name for the broker, nor any documentation for this alleged transfer.[62]  Mehran reiterated that $6 million in diamonds had been shipped to Fine Diamonds in New York two days prior, but he could produce no documentation to support this either.[63]

Mehran claimed that the remainder of Fine Diamonds' diamond stock was in sealed cachet boxes being held in a safe in the basement of the building.[64]  Mehran and Doran made four total trips to the basement to retrieve cachet boxes.[65]  In Mehran's office, Mehran refused to allow Doran and Lester to open the cachets, which Mehran asserted contained $8 million in diamonds, claiming that by opening the cachets without the prospective buyers' permission, the parties would face possible arbitration in Israel.[66]  But Mehran was reluctant to provide the

---

[60]    *Id.* at ¶ 45.

[61]    *Id.* at ¶ 46; Lester Decl. at ¶ 25.

[62]    Lester Decl. at ¶ 27.

[63]    *Id.* at ¶ 28.  Later that day, Lester and Doran each independently attempted to verify the shipments.  Lester asked the manager at Malca-Amit to check Malca-Amit's records, which revealed no evidence of any December shipment from Mehran to Fine Diamonds in New York.  *Id.* at ¶ 36.  In addition, Mehran produced a document to Doran that Doran immediately recognized as not being an authentic Malca-Amit document.  Doran Decl. at ¶ 52.  These diamonds were never received by Fine Diamonds.  Lester Decl. at ¶ 28.

[64]    Lester Decl. at ¶ 29; Doran Decl. at ¶ 48.

[65]    Doran Decl. at ¶ 49.

[66]    *Id.* at ¶ 50.

names of the prospective buyers so that the Meents' could contact them to request permission to open the cachets.[67]

Even if believed, the total amount of diamonds that Mehran claimed to have produced that day did not total the $47 million he had originally claimed to have in his possession.[68] Doran and Lester inquired about the balance.[69]  Mehran informed them that the remaining diamonds were in another safe in the building—but that he did not have access to the safe, as Mitch, who had been in Tel Aviv the week before, had taken the key back to New York with him.[70]  As Mehran later admitted in his deposition, no additional safe ever existed.  As Mehran admitted, "I used that as an excuse just to calm him down. . . . I never had another safe."[71]

By this time, as the building was ready to close, Lester took the loose diamonds and cachet boxes to the local office of Malca-Amit[72] in sealed bags for safekeeping for the night.[73]

Lester decided that Doran should return to New York the following morning, Monday, December 8, to confront Mitch there.  Doran thus returned to New York.[74]  Before leaving Israel, however, Doran called Mitch, who told Doran that he (Mitch) had four boxes of GIA-certified diamonds in his office in New York that he was willing to give to Doran's father, Jeffrey, who was then in New York.[75]  While Doran was flying back to New York on December 8, Jeffrey

---

[67]     *Id.*

[68]     *Id.* at 50–51.

[69]     *Id.* at 51.

[70]     *Id.*; Lester Decl. at ¶ 33.

[71]     Mehran Dep. Tr. 156:21–157:2.

[72]     Malca-Amit is a bonded diamond courier serving the diamond industry all over the world.  Lester Decl. at ¶ 34.

[73]     Doran Decl. at ¶ 51; Lester Decl. at ¶ 34.

[74]     Lester Decl. at ¶ 38.

[75]     Doran Decl. at ¶ 55.

collected 88 stones from Mitch at Mitch's office, which Mitch claimed to be worth approximately $800,000.[76]

In the meantime, Lester (who was still in Tel Aviv) met with Barack Sharabi, a Tel Aviv attorney, who advised Lester to open the cachets only in the presence of third parties and to do it on videotape.[77] After confronting Mehran again in his office on December 8—at which time Mehran refused to provide any further diamonds or information—Lester had the sealed bags being held by Malca-Amit transferred to the offices of another attorney in Tel Aviv, Gabi Savran, who documented and videotaped the process of inspecting and opening the cachets.[78]

The cachets' opening revealed that the cachets maintained by Mehran were empty, except for one box.[79] In fact, 85 to 90% of the parcels (small envelopes which would normally contain one diamond each) were completely empty, and those parcels that did contain diamonds were immediately identifiable as diamonds that had been swapped out, because they did not correspond to the value of the diamond listing on the face of the box.[80] After inspecting these diamonds, Lester established that these were diamonds of inferior quality having little value.[81]

Lester also found that some of the boxes simply contained magazines, rather than diamond parcels, in order to give the false impression that they were weighted down with heavy diamond stock.[82] Mehran admitted during his deposition that the cachets were not real, and that he and his staff deliberately put them together on the morning of December 7, 2008 with

---

[76]    *Id.* at ¶ 56.

[77]    Lester Decl. at ¶ 39.

[78]    *Id.* at ¶ 43. The video recording and a transcript of the recording were provided to the Court. *See* Pl. Exh. 13; Pl. Exh. 14.

[79]    Lester Decl. at ¶ 44.

[80]    *Id.*

[81]    *Id.*

[82]    *Id.* at ¶ 45.

-16-

magazines and empty parcel papers to give the appearance of productive business to deceive Doran and Lester Meents.[83]  Mr. Sharabi took custody of the few diamonds found in the cachets and locked them away in his safe.[84]  Mr. Sharabi subsequently consulted a diamond company to provide independent valuation and to provide a secure place for the diamonds.[85]

The next day, Tuesday, December 9, 2008, Lester had a phone conversation with Mehran that he recorded using a service available in Israel.[86]  In this conversation, Mehran did not dispute that Peykar International owed money to Fine Diamonds.  Mehran disputed only the amount owed—claiming that the amount was approximately $23 million, rather than the approximately $37 million shown as outstanding in Doran's records.[87]

*9. Doran and Jeffrey Meet with Mitch in New York*

Meanwhile, on Tuesday, December 9, Doran (who, as previously noted, by this time had returned to New York) went to Mitch's New York office with Doran's father Jeffrey.[88]  Doran brought a digital audio recording device with him to the meeting, which he used to record the entire exchange.[89]  Doran also brought with him the chart that he had sent to Mehran on December 5, listing the batches of diamonds delivered and the payments received.[90]

---

[83]     Mehran Dep. Tr. 125:14–129:6, 168:8–170:11.

[84]     Lester Decl. at ¶ 47.

[85]     *Id.*

[86]     *Id.* at ¶ 48.  A transcript of this audio recording was provided to the Court.  *See* Pl. Exh. 16.

[87]     Lester Decl. at ¶ 49.  For example, when Lester questioned if Mehran was uncertain about the amount owed, Mehran clarified that "[i]t's not that I'm uncertain, I'm not in the office right now.  I remember talking about something about ah 23 altogether that's more or less what I remember." (*sic*) Pl. Exh. 16 at 4.

[88]     Doran Decl. at ¶ 57.

[89]     *Id.*  Pl. Exh. 11; Pl. Exh. 12.

[90]     Doran Decl. at ¶ 57; Pl. Exh. 3.

Doran began the meeting by asking Mitch to confirm to Jeffrey that Doran had delivered over $100 million worth of diamonds in late 2007 and 2008, as reflected on the chart.[91]  Mitch did not dispute that he had received over $100 million in goods; however, he wanted to know what the Meents had retrieved from Mehran in Israel.[92]  Mitch acknowledged on several occasions owing money to Fine Diamonds, but he never agreed on the amount.[93]  Instead, Mitch claimed that the amount was between $15 and $18 million.[94]

The meeting concluded with an acknowledgement by Mitch that he was holding a two carat stone that was in a cachet to be sold to someone, and he asked that he be able to complete the sale.[95]  Jeffrey informed Mitch that he did not want Mitch to sell any more of Fine Diamonds' diamonds, and wanted the stone returned to him.[96]  When Mitch responded that he could not return the stone (as it was in a cachet being held by someone else), Jeffrey said that he would come back the following day to retrieve the diamond.[97]

When Doran and Jeffrey returned to Mitch's office the next day, Wednesday, December 10, Mitch informed Doran and Jeffrey that he could not return the diamond, as he had been instructed by Mehran not to return anything further.[98]  Mitch did, however, hand over $2,000 in cash that he had in his safe, which Doran deposited in Fine Diamonds' bank account.[99]

---

[91]     Doran Decl. ¶ 58.

[92]     *Id.*

[93]     *Id.* at ¶ 59.  *See, e.g.*, Pl. Exh. 12 at 27 ("I owe you money. . . . We know that we owe money.").

[94]     Doran Decl. at ¶ 62; Pl. Exh. 12 at 78.

[95]     Doran Decl. ¶ 63.

[96]     *Id.*

[97]     *Id.*

[98]     *Id.* at ¶ 64.

[99]     *Id.*

*10. Criminal Investigation*

When subsequent attempts by Lester to meet with Mehran proved fruitless, Lester contacted the Fraud Department of the Israeli police in Tel Aviv and filed a formal complaint.[100] On Sunday, December 14, 2008, Mehran was arrested in Israel, and his home and office were searched by the Israeli police, on suspicion of grand larceny.[101]  The Israeli police confirmed that there was no additional safe at Mehran's office in Tel Aviv.[102]

That same day, Mitch called Doran to tell Doran about Mehran's arrest in Israel, and to seek a possible settlement.[103]  Doran replied that once a settlement was reached in principle, Mitch had to have diamonds or money (or both) readily available to follow through on it, and that the settlement would have to be done in the presence of attorneys for each side.[104]  Mitch agreed, and said he would be in touch the following day.[105]  The next day, however, Mitch was apparently admitted to Long Island Jewish Hospital for cardiac problems.[106]  No further discussions occurred between Doran and either of the Peykars.[107]

*11. Procedural Matters*

On February 4, 2009, creditor Nedbank Ltd. ("**Nedbank**") filed an involuntary chapter 7 petition against Fine Diamonds LLC.  The same day, Nedbank:

---

[100]    Lester Decl. at ¶ 51.

[101]    *Id.* at ¶ 52.

[102]    *Id.*  However, there was no evidence in the trial before this Court that there was a conviction following that arrest, and the Court draws no factual conclusions or inferences based on the arrest alone.

[103]    Doran Decl. at ¶ 65.

[104]    *Id.*

[105]    *Id.*

[106]    *Id.* at ¶ 66.

[107]    *Id.*

(a) moved for the immediate appointment of an interim chapter 7 trustee, under section 303(g) of the Code,[108] pending consideration of its request for an order for relief;

(b) filed this adversary proceeding, seeking to recover, on behalf of the Fine Diamonds estate, "over $36 million"[109] of diamonds (the "**Transferred Diamonds**") allegedly converted or embezzled from the Debtor;[110] and

(c) sought an *ex parte* temporary restraining order ("**TRO**") freezing the Debtor's and Peykar International's assets.

In the evening of that day, the Court signed an *ex parte* TRO (after finding that advance notice of the TRO request would cause irreparable harm to the Debtor's estate and to the Debtor's creditors) which, among other things:

(a) enjoined the Defendants from disposing of diamonds of any value, and any other assets of a value greater than $100, pending a hearing on continuation of the TRO;

(b) authorized the securing of Peykar International's office;

(c) declined to immediately appoint an interim trustee or to order immediate turnover;

(d) gave Nedbank the authority to sue on behalf of the estate until a trustee was appointed; and

---

[108]    That provision authorizes the appointment of an interim chapter 7 trustee even before an order for relief, if necessary to preserve the property of the estate or to prevent loss to the estate.

[109]    Cmplt., ECF # 1 at ¶ 1.  The amount now being sought is $37,593,930.34.  *See* Pl.'s Proposed Findings of Fact, ECF # 104 at ¶ 10.

[110]    Cmplt. at ¶ 1.  At the time, the defendants were Peykar International, Mitch, and Doran.

(e) set a hearing on continuation of the TRO, and appointment of an

interim trustee, to be held two days later. [111]

At the hearing two days later, the Trustee was appointed under section 303(g) of the Bankruptcy

Code, and the Court continued the TRO, subject to adjustments to allow those restrained to live

their daily lives.  On July 24, 2009, the Trustee filed an Amended Complaint, substituting

himself as Plaintiff, adding Mehran as a defendant, and dropping Doran from the suit.[112]  From

then on, Peykar International, Mitch, and Mehran (collectively, the "**Defendants**") were the

defendants.

Before the now-relieved Mr. Stanton represented the Defendants, another attorney, Paul

Millus, represented them, throughout most of the pre-trial proceedings.  In January 2011, 10 days

before the trial in this adversary proceeding was scheduled to begin, Mr. Millus too asked to be

relieved from his representation of the Defendants, though, duly protecting the attorney-client

privilege, Mr. Millus was not specific in saying why he sought to be relieved, other than to

attribute it to differences with his clients.  The Defendants informed the Court not only that they

did not oppose Mr. Millus' request, but that they supported it.  The Court granted the application

to withdraw, and upon the Defendants' request, pushed the trial back by a month, to begin

February 17, 2011.[113]

The Defendants then retained Mr. Stanton, who, a week before the February 17 trial date,

requested a further adjournment.  After an on-the-record conference call with the parties, and

after determining that the appearance of the Trustee's trial witnesses could be rescheduled with

---

[111]    *See* Umbrella Case ECF # 5.

[112]    Am. Compl., ECF # 28.  The Defendants argued in their Post-trial Brief that when Doran was dismissed
from the lawsuit, he was effectively granted immunity.  Defs. Post-Trial Br., ECF #96 at ¶ 4.  The Court
considered this likely to be true, but nevertheless found Doran's testimony to be credible.

[113]    *See* ECF # 49; ECF # 50.

minimal prejudice, the Court granted still another adjournment, rescheduling trial for March 17 and 18, 2011.[114]

On March 14, 2011, a week before the third trial date, the Defendants' counsel Mr. Stanton filed a letter request for "Emergency Injunctive Relief" with the district court, seeking to withdraw the reference and "to stay all proceedings" in this case "pending the same."  Judge Koeltl of the district court denied that request by endorsed order.[115]  The same day, March 15 (now, two days before the trial on the third date that had been set), Mitch, acting without his counsel, wrote Judge Koeltl making two additional requests for a stay—with each seeking such a stay "pending final determination whether this debtor is properly before the court," and whether the Bankruptcy Court had jurisdiction over the adversary case.[116]  Each was denied by Judge Koeltl, by endorsed order.[117]

The trial was held on March 17 and 18, 2011. The Court found the testimony of Doran and Lester (the former of whom Mr. Stanton cross-examined, and the latter of whom Mr. Stanton cross-examined only on evidentiary foundation matters) credible.  But the Court had no occasion to consider Mitch's and Mehran's credibility, as each failed to appear for cross-examination, and, by reason of that failure, the Court struck their direct testimony declarations.[118]

---

[114]    *See* ECF # 67; Umbrella Case ECF # 107.

[115]    *See* Case No. 1:11–CV–01130–JGK, ECF # 4 (S.D.N.Y. Mar. 15, 2011).

[116]    *Id.*, ECF # 5 (S.D.N.Y. Mar. 31, 2011); *Id.*, ECF # 6 (S.D.N.Y. Mar. 16, 2011).

[117]    *Id.*

[118]    In accordance with the Court's usual practice, direct testimony was taken by affidavit or declaration, and cross-examination and subsequent testimony was taken live.  The testimony of Trustee witnesses Lester and Doran was taken in that fashion, though the Defendants' counsel waived his right to cross-examine Lester.  Defendants Mitch and Mehran likewise offered direct testimony by declaration, but they failed to appear for cross-examination without explanation.  As a consequence, their direct testimony was stricken, and after a later evidentiary hearing at which Mitch and Mehran proffered explanations as to their failure to appear and contact the Court and their counsel (most of which the Court found unworthy of belief), the Court adhered to its earlier ruling.  *See Nedbank, Ltd. v. Peykar International Co., Inc. (In re Fine Diamonds, LLC)*, 2011 Bankr. LEXIS 2355, 2011 WL 2447725 (Bankr. S.D.N.Y. Jun. 14, 2011).  The Defendants appealed that ruling, but on March 28 of this year, their appeal was dismissed, by Judge Kaplan

-22-

Mr. Stanton nevertheless could, and did, file a post-trial brief.  It has been duly

considered in connection with this Decision.[119]

<u>Discussion</u>

As noted above, the Trustee seeks relief on four separate grounds:

(1) Turnover, under section 542 of the Code;

(2) Fraudulent transfer doctrine, under sections 548, 544 and 550 of the

Code;

(3) Conversion; and

(4) Fraudulent misrepresentation.

The Court considers them in turn.

*1.  Turnover*

Count 1 of the Amended Complaint seeks a judgment for the turnover or value of the

Transferred Diamonds under section 542 of the Bankruptcy Code.  Section 542(a) provides, in

relevant part, that:

> [A]n entity, other than a custodian, in possession, custody,
> or control, during the case, of property that the trustee may
> use, sell, or lease under section 363 of this title, . . . shall
> deliver to the trustee, and account for, such property or the

---

of the district court, for their failure, for a year and a half after their appeal was filed, to file briefs or
otherwise prosecute it. *See* Order, Case No. 11 Civ. 6064 (LAK) (S.D.N.Y. Mar. 28, 2013) (also docketed
at ECF # 106 in this proceeding).

[119]   In its decision following its post-trial evidentiary hearing on Mitch and Mehran's motion to vacate the
Court's earlier order striking their direct testimony declarations after their failure to appear for cross-
examination, the Court made a number of findings as to their credibility at that hearing, including findings
that their explanations were "wholly non-credible," 2011 Bankr. LEXIS 2355, at *1-3, 2011 WL 2447725,
at *1, "unworthy of belief," *id.*, and, indeed, "an insult to my intelligence." *Id.*  But since the direct
testimony of Mitch and Mehran was stricken and cross-examination did not take place, the Court did not
need to, and did not make, credibility determinations with respect to anything they might otherwise have
said at the trial itself.  The Court based its factual findings here on the testimony of Doran and Lester; the
documents; and deposition testimony by Mitch and Mehran.  The Court did not consider its findings that
Mitch's and Mehran's post-trial evidentiary hearing testimony should be disbelieved to be evidence of bad
character or otherwise to be relevant to any factual findings to be made in the trial.

value of such property, unless such property is of
inconsequential value or benefit to the estate.

Under caselaw applying New York law,[120] a debtor that consigns goods to another retains title to those goods[121]—and consequently, those goods still constitute property of the estate, and are property that the trustee can use, sell or lease.

The Trustee asserts in his Post-trial Brief that the "testimony and documentary evidence at trial clearly established that Doran delivered to both Mitch and Mehran on consignment a series of batches of diamonds."[122] The Trustee continues that "[s]ince title to the diamonds did not pass to the Peykars during these consignment transactions, the diamonds remain property of the estate, subject to the turnover provisions of 11 U.S.C. §§ 541-542."[123]

In their Post-trial Brief, however, the Defendants dispute that. In doing so, they argue two things. First they contend that there were no consignments at all, but rather merely sales on unsecured credit.[124] Then they argue that if the transfers of the diamonds were in fact on consignment, the requirements under the New York Uniform Commercial Code ("**UCC**") for protecting a consignment were not satisfied, and thus that any consignment cannot be regarded as valid.[125] The Court is unpersuaded by either contention.

---

[120]    Neither side addressed choice of law in its briefs. New York has the greatest interest in the application of its law because Fine Diamonds' principal place of business was in New York.

[121]    *See United States v. Nektalov*, 440 F. Supp. 2d 287, 298 (S.D.N.Y. 2006) (Leisure, J.) ("*Nektalov*"); *see also Rahanian v. Ahdout*, 258 A.D.2d 156, 159, 694 N.Y.S.2d 44, 47 (1st Dep't 1999) ("*Rahanian*").

[122]    Pl. Post-Trial Br., ECF # 96 at 24.

[123]    *Id.* at 25.

[124]    Defs. Post-Trial Br. at ¶ 23 ("[T]hese transfers were not consignment sales where title remained with Plaintiff, but in fact sales on unsecured credit, and Plaintiff's [*sic*] has no lien or ownership interest in the diamonds that could be converted or embezzled . . . .").

[125]    *Id.* at ¶ 24. They say:

> A consignment is a secured transaction, and is explicitly governed by New York State's Uniform Commercial Code Article 9 (see New York State Uniform Commercial Code 9-109(a)(4)[)]. As such, both a filed Financing Statement (see UCC 9-310[)] and Security Agreement

First, Doran's testimony that the parties intended a consignment[126] was undisputed, and in fact each of the Defendants *admitted* that the transaction was a consignment—Mitch, in his deposition testimony,[127] and Mehran, in his answer.[128]  All of the testimony with respect to intent, and nearly all of the testimony with respect to indicia of consignment, supports the Trustee's view.

Second, the Defendants' assertion that Fine Diamonds' failure to file a financing statement or a security agreement relieved Fine Diamonds of any ownership interest in the diamonds is contrary to express terms of the UCC's provision under which consignments are governed.

### A.  Existence of Consignment

Under New York law, a "true consignment"[129] is essentially an agency with a bailment.[130]  If there were a dispute as to whether that was the arrangement here, the Court

---

describing the secured property (see UCC 9-203) are required for the secured party (here, the Debtor) to perfect its security interest in the transferred diamonds.  Therefore, the Debtor as selling party must have a perfected security interest in the diamonds transferred to the Peykar Defendants in order to claim any continuing ownership interest in such diamonds transferred to and now held by the Peykar Defendants.  Failing this, if the Debtor was not paid the agreed full price for its transferred diamonds, the Debtor's sole remedy is to bring suit for breach of contract and potentially obtain a money judgment against the Peykar Defendants for the unpaid purchase price.

[126]    *See* page 5 & n.7 above.

[127]    *See* page 6 & n.9 above.

[128]    *See* page 6 & n.10 above.

[129]    By contrast, in a situation where Party 1 (the "wholesaler") transfers goods to Party 2 (the "merchant") who in turn sells the goods to consumers, courts use varying terminology.  For purposes of this decision, "true consignment"—or simply "consignment"—refers  to a situation where the wholesaler delivers goods to the merchant but retains title to them.

Some cases have referred to a different situation—where the parties intend that title should pass to Party 2—as a "consignment intended as security," *see In re Ide Jewelry Co.*, 75 B.R. 969, 977 (Bankr. S.D.N.Y. 1987) (Buschman, J.), or as a "sale or return."  *See Rahanian*, 258 A.D.2d at 157–59, 694 N.Y.S.2d at 46–47.  Here, the Defendants argue that the transfers of diamonds from Fine Diamonds to the Peykars were "sales on unsecured credit."  Defs. Post-Trial Br. at ¶ 23.  Regardless of the name used to describe these transfers, the issue is the same—which party retained title to the diamonds.

would engage in a factual inquiry to determine whether the parties intended a consignment, with the associated agency relationship,[131] and, to the extent that it was inconclusive, perhaps look at other indicia.  But here, of course, in testimony the Court found credible,[132] Doran expressly described the intent on the two sides that title remain with Fine Diamonds.[133]  And, importantly, each of Mitch and Mehran *admitted* the alleged consignment, confirming the parties' intent, which ultimately is controlling.[134]

Additionally, while the objective indicia of the two sides' intent are not as critical as the statements by Doran and the express admissions by Mitch and Mehran, nearly all of those objective indicia support a factual finding of a consignment as well.  The dealings relevant here began when, in 2006, Mehran said *he did not want the responsibility of taking on credit*.[135] Thereafter, as Mitch testified, the Debtor "would provide us with stone[s]," and that after receiving the stones, "we have to sell and give him back the money."[136]

Notably, Mitch phrased it that way (with sale and then payment), rather than speaking in terms of Peykar International having bought the diamonds, for which payment would then be

---

[130]    *See Nektalov*, 440 F. Supp. 2d at 298 (citing *Gem Diamond Co. of N.Y. v. Klein*, 1995 LEXIS 2028, at *5, 1995 WL 72382, at *2 (S.D.N.Y. Feb. 21, 1995) (Wood, C.J.) ("*Klein*")); *Rahanian*, 258 A.D.2d at 159, 694 N.Y.S.2d at 47.

[131]    *See Nektalov*, 440 F. Supp. 2d at 298–99.

[132]    Because it was the practice here, if not also generally in the diamond industry, to put so little in writing, credibility was of considerable importance.

[133]    "Title to the diamonds remained with Fine Diamonds, but possession was given to one of the Peykars, who would try to solicit sales to customers."  Doran Decl. at ¶ 12.

[134]    *See, e.g.*, *Matter of Friedman*, 64 A.D.2d 70, 81–82, 407 N.Y.S.2d 999, 1006 (2d Dep't 1978) (looking to extrinsic evidence to determine the parties' intent where the written contract evinced "both the elements of a sale and the elements of a consignment").  This approach is also followed in other jurisdictions.  *See, e.g.*, *Taylor v. Wachtler*, 825 F. Supp. 95, 103 (E.D. Pa. 1993) (Brody, J.) ("The intent of the parties controls as to whether an agreement is a consignment."); *Consol. Accessories Corp. v. Franchise Tax Bd.*, 161 Cal. App. 3d 1036, 208 Cal. Rptr. 74 (2d Dist. Ct. App. 1984) ("If . . . the parties to the transaction intend passage of title, the transaction may be regarded as a contract of sale rather than a bailment.  In determining which event occurred, bailment or contract of sale, the intent of the parties is controlling.") (citation omitted).

[135]    *See* page 5 above.

[136]    *See* page 6 & n.9 above.

due—immediately, within 10 or 30 days, or at any other fixed time before diamonds were sold to

third parties. And Mitch's testimony that "whatever diamonds he [Doran] brought in a box you

would accept"[137] further supports Doran's testimony that delivery was merely on consignment.

If the delivery of the diamonds were on consignment, there would be no risk associated with

accepting them so indiscriminately; if the diamonds couldn't be sold, they could simply be

returned. But if the diamonds had actually been purchased by Peykar International when it took

them, Peykar International would be liable to the Debtor for very sizable sums while being

unable to sell the diamonds to anyone else.

There was, however, one statement by Doran that, based on one of two possible readings

of it, could be read to cut the other way. Doran testified that "Mitch and Mehran would . . . remit

a previously agreed upon price to Fine Diamonds, keeping any profit above our negotiated

price."[138] That statement is ambiguous, being capable of being read in two ways. By one

reading, such an arrangement would still be an ordinary consignment, with the consignee liable

merely to hand over to the consignor the consignment price, with the freedom to keep anything

more than that received by the ultimate purchaser, as the commission or otherwise. By another,

it could be deemed to be an ordinary sale. But the underlying fact then stated would in any event

be insufficient to trump all of the other evidence of intent, as described in detail above.

### B. Failure to File Financing Statement

The Court also agrees with the Trustee with respect to his contention that the failure to

file a financing statement does not cause the Fine Diamonds estate to have forfeited its

ownership in a dispute with Peykar International. The UCC does not prescribe rules for

---

[137]      *See* n.8 above.

[138]      Doran Decl. at ¶ 12 (emphasis added).

determining the legal relationship between the consignor and the consignee.[139] In fact, comment 6 to N.Y. UCC § 9-109 expressly states that Article 9 does not apply to the relationship between consignor and consignee:

> For purposes of determining the rights and interests of third-party creditors of, and purchasers of the goods from, the consignee, *but not for other purposes, such as remedies of the consignor*, the consignee is deemed to acquire under this Article whatever rights and title the consignor had or had power to transfer. . . . *The relationship between the consignor and consignee is left to other law.*[140]

The Court does not need to address how it would deal with failures to comply with required consignment formalities if they came at the expense of secured or unsecured creditors of consignee Peykar International, or purchasers from that entity. Here the dispute is between the consignor and consignee—consignor Fine Diamonds and consignee Peykar International. The principles defining that relationship are left to law other than the UCC.[141]

Thus, if the relationship otherwise was one of consignment—as the Court finds here—the UCC provisions that would require the filing of a financing statement and security agreement to protect consignor rights as against third parties are not applicable here.[142] The Defendants' argument that "the Debtor as selling party must have a perfected security interest in the

---

[139] "[C]onsignments are . . . treated differently than true security interests. This is because a consignment, although like a security interest as regards its effects upon third parties claiming an interest in the goods, is not treated as a security interest as between the consignee and the consignor." *See Nektalov*, 440 F. Supp. 2d at 297 n.7 (citation omitted).

[140] N.Y. U.C.C. § 9-109 cmt. 6 (McKinney 2002) (emphasis added).

[141] *See Nektalov*, 440 F. Supp. 2d at 298 n.7 ("Because no third-party creditor rights are involved in this matter, the UCC is inapplicable and the Court shall determine the rights of the parties . . . using common law precepts.").

[142] *See Rahanian*, 258 A.D.2d at 158, 694 N.Y.S.2d at 47 ("Since in this matter no creditor's rights are implicated, if the contract between the parties is found to be a consignment, these particular UCC provisions [*i.e.*, § 9-319(a)] would not be applicable.").

-28-

diamonds transferred to the Peykar Defendants in order to claim any continuing ownership interest in such diamonds"[143] is simply not supported by the law.

Rather, because no third-party rights of Peykar International creditors or purchasers are at stake here, the Court determines the claim of consignment (and resulting continuing ownership) using common law precepts,[144] fully addressed above.

### C. Consignment Conclusion

Accordingly, the Court finds, as a fact or mixed question of fact and law, that the diamonds given by Fine Diamonds to Peykar International beginning in 2007 were entrusted to Peykar International on consignment, and were not sold on credit. Thus, title did not pass to the Peykars during these consignment transactions, and the Transferred Diamonds remained property of the estate, subject to the turnover provision, section 542.

As previously determined, the value of the Transferred Diamonds held by Peykar International was $37,593,930.34. With no basis for a finding that Peykar International can return those diamonds in kind, judgment must be entered against Peykar International in that amount.

### 2. Fraudulent Transfers

In Counts 3 and 5 of the Amended Complaint, the Trustee seeks:

(a) to avoid the transfer of the missing diamonds under sections 548 and 544 of the Bankruptcy Code, respectively; and

---

[143]     Defs. Post-Trial Br. at ¶ 24.

[144]     Under N.Y. U.C.C. § 1-103:

Unless displaced by the particular provisions of this Act, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

(b) recovery of their value, pursuant to section 550 of the Code, from

Peykar International, Mitch and Mehran, pursuant to Bankruptcy Code section

548(a)(1)(B) and New York Debtor and Creditor Law section 276, respectively.

Each is premised, in substance, on constructive fraudulent transfer doctrine, and on the claim that

these Defendants caused the transfer of the consigned diamonds to themselves.

Based on its factual findings set forth above, the Court is satisfied that Peykar

International caused the missing diamonds to be transferred to itself, and for no consideration.

The Court further finds that the transfers were made when Fine Diamonds was insolvent, or

rendered it so.  On that showing, the Court can and does impose fraudulent transfer liability on

Peykar International, but cannot impose transferee liability on Mitch and Mehran.

### A.  Section 548 Claims

The Trustee first asserts that the transfer of the Transferred Diamonds should be avoided

under section 548(a)(1)(B)—alleging that the diamonds were transferred for less than reasonably

equivalent value (*i.e.*, for no consideration whatever), and that the Debtor (i) was insolvent on

the date such transfer was made or became insolvent as a result of such transfer; (ii) was engaged

in a business or transaction, for which any property remaining was an unreasonably small

capital; or (iii) intended to incur, or believed that the Debtor would incur, debts that would be

beyond the Debtor's ability to pay as such debts matured.

548(a)(1)(B) permits recovery only with respect to transfers made within the two years

prior to the filing of the bankruptcy petition.  But Batches 30 through 53 (Batch 53 being the

final batch to be transferred to the Peykars) were all received by Peykar International, and (to the

extent Fine Diamonds wasn't paid for them) kept by Peykar International, well within the two year period.[145]

The first prong of the 548(a)(1)(B) test—that the transfer was made for less than reasonably equivalent value—requires no extensive analysis, and here is easily met. No value whatever was received for $37,593,930.34 of Transferred Diamonds. Over the course of the relationship, Fine Diamonds transferred over $125 million in diamonds to the Peykars and received only approximately $87 million in payments, leaving over $37 million owed by the Peykars to Fine Diamonds, after accounting for approximately $2 million in returned diamonds.[146]

Next, section 548(a)(1)(B) requires that the Debtor be insolvent at the time of the transfers or rendered insolvent by the transfers. Once a court determines that the property was transferred without fair consideration, the burden shifts under New York law to the defendants to establish that the debtor was solvent at the time of the transfers.[147] The same presumption has been applied to constructive fraudulent transfer litigation under section 548.[148]

The Defendants argue that the Trustee failed to provide "require[d] proof . . . of the Debtor's . . . insolvency at the time of Debtor's diamond transfers to the Peykars."[149] But as the

---

[145]    *See* Pl. Exh. 3.

[146]    *See* pages 8–9 & n.26 above.

[147]    *See Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A.*, (*In re* Fabrikant), 447 B.R. 170, 195 (Bankr. S.D.N.Y. 2011) (Bernstein, C.J.) (citing *Feist v. Druckerman*,70 F.2d 333, 334 (2d Cir. 1934); *Geron v. Schulman (In re Manshul Constr. Corp.)*, 2000 WL 1228866, at *53 (S.D.N.Y. Aug. 30, 2000) (Koeltl, J.); *Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant, Inc.)*, 337 B.R. 495, 505 (Bankr. S.D.N.Y. 2006) (Bernstein, C.J.) (discussing the New York Debtor & Creditor Law); *Hassett v. Far West Fed. Savs. & Loan Ass'n (In re O.P.M. Leasing Servs., Inc.)*, 40 B.R. 380, 393 (Bankr. S.D.N.Y.) (Lifland, C.J.) (same), *aff'd*, 44 B.R. 1023 (S.D.N.Y. 1984), *aff'd*, 769 F.2d 911 (2d Cir. 1985)).

[148]    *See In re Fabrikant*, 447 B.R. at 195 (citing *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 672 (Bankr. E.D.N.Y. 2008)).

[149]    Defs. Post-Trial Br. at ¶ 47.

Trustee fairly observes,[150] the burden shifted to the Defendants to demonstrate the Debtor's

solvency at the time of the transfers of the Transferred Diamonds.  As the Defendants submitted

no evidence as to the Debtor's solvency at the time of the transfers in question, Debtor Fine

Diamonds is presumed to have been insolvent at the time Peykar International took the diamonds

for itself, and the transfers of $37,593,930.34 in diamonds to Peykar International can and must

be avoided under section 548(a)(1)(B) of the Code.

>    *B.  Section 544 Claims*

The Trustee then asserts that the transfer of the Transferred Diamonds should also be

avoided under section 544 of the Code.  Section 544 authorizes the commencement of an action

by a trustee on behalf of a debtor's estate to bring causes of action for the ultimate benefit of the

debtor's creditors under applicable state law—as applicable here, N.Y. Debtor and Creditor Law

§ 273.

N.Y. Debtor and Creditor Law § 273 provides:

> Every conveyance made and every obligation incurred by a
> person who is or will be thereby rendered insolvent is
> fraudulent as to creditors without regard to his actual intent
> if the conveyance is made or the obligation is incurred
> without a fair consideration.

Here the Trustee asserts that the transfer of the missing diamonds must be avoided under

that provision because the transfer of the Transferred Diamonds was made for no

consideration—and while the Debtor was insolvent or would be rendered thereby.

As noted above, the Transferred Diamonds were appropriated by Peykar International

"without a fair consideration"—for no consideration at all—and the burden of proving

---

[150]    Pl. Post-Trial Br. at 28.

insolvency thus shifted to the Defendants.  The Defendants failed to come forward with any

evidence of solvency.  The transfers must be avoided under § 273 as well.

### C.  Section 550 Liability

Then, Count 6 of the Amended Complaint seeks a money judgment, under section 550 of

the Bankruptcy Code, for the value of the diamonds whose transfer was avoided under

Bankruptcy Code sections 548 and 544 and N.Y. Debtor and Creditor Law § 273.

Section 550 provides that:

> [T]he trustee may recover, for the benefit of the estate, the
> property transferred, or, if the court so orders, the value of
> such property, from—(1) the initial transferee of such
> transfer or the entity for whose benefit such transfer was
> made; or (2) any immediate or mediate transferee of such
> initial transferee.

Section 550 authorizes the recovery of the value of property transferred, as an alternative

to recovery of the property itself, when "the court so orders."  Neither section 550, nor any other

section of the Bankruptcy Code, lays out standards governing when a court should "so order[]."

But the standards for doing so, derived from *Collier* and caselaw, are nevertheless clear.  Section

550 is intended to restore the estate to the financial condition it would have enjoyed if the

transfer had not occurred.[151]  Factors considered by courts in deciding whether to order recovery

of the property or its value include whether the property is recoverable, whether there is

conflicting evidence as to the value of the property, and whether the value of the property is

readily determinable and a monetary award would result in a savings to the estate.[152]

---

[151]    5 *Collier on Bankruptcy* ¶ 550.02 (16th ed. 2013) (citing *Acequia, Inc. v. Clinton (In re Acequia, Inc.)*, 34
F.3d 800, 812 (9th Cir. 1994); *Feltman v. Warmus (In re American Way Serv. Corp.)*, 229 B.R. 496, 530–
31 (Bankr. S.D. Fla. 1999) (Gregg, C.J.); *Aero-Fastener, Inc. v. Sierracin Corp. (In re Aero-Fastener, Inc.)*,
177 B.R. 120, 139 (Bankr. D. Mass. 1994) (Boroff, J.)).

[152]    *See id.*

Here restoring the estate to the financial condition it would have enjoyed if the transfer had not occurred requires issuance of a money judgment for the Transferred Diamonds' value. And the caselaw factors compel relief of that character as well. Here the Court lacks the ability to achieve the return of the Transferred Diamonds themselves; efforts to secure the diamonds' return have been fruitless. There was no conflicting evidence as to the Transferred Diamonds' value, and their value was readily ascertainable. A judgment for the value of the Transferred Diamonds is plainly appropriate.

But while the Court can and will enter such a judgment with respect to Defendant Peykar International, it cannot do the same with respect to Mitch and Mehran. The Court lacks an evidentiary basis for doing so.

Section 550 lays out the entities from which the fraudulent transfers may be recovered, and requires that any such entity be either an initial transferee of such transfer; an entity for whom such transfer was made; or an immediate or mediate transferee of such initial transferee. But the Trustee seeks to impose section 550 liability on Mitch and Mehran not on those grounds, but rather under a substitute theory. He asks the Court to impose liability on Mitch and Mehran (as contrasted to Peykar International) because they "are the sole shareholders/members/officers and employees of the corporate defendant," and because each had check writing abilities.[153] But while such persons may, in some cases, turn out to be transferees and be liable as such, their status as shareholders, LLC members or officers, by itself, does not make them liable. More needs to be shown as an evidentiary matter, and here it was not.

---

[153]    Pl. Post-Trial Br. at 29.

### 3. Conversion

Count 7 of the Amended Complaint seeks to impose liability with respect to the Transferred Diamonds—on each of Peykar International, Mitch, and Mehran—for conversion. Here the Court finds the Trustee to have plainly made a sufficient showing, and with respect not just to Peykar International, but Mitch and Mehran as well.

Conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."[154] The two elements of conversion are "(i) plaintiff's possessory right or interest in the property; and (ii) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights."[155]

As previously found, Fine Diamonds retained title to the Transferred Diamonds when the diamonds were transferred to the Peykars on consignment. And by failing to either return the Transferred Diamonds or the sale proceeds, Peykar International interfered with Fine Diamonds' ownership of the Transferred Diamonds. Several courts have expressly held that if a consignee fails to return consigned goods or the value of such goods to the consignor upon request, the consignee is liable for conversion.[156]

Thus, Peykar International is plainly liable for conversion of the Transferred Diamonds.

---

[154] *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth. of the City of El Paso*, 87 N.Y.2d 36, 44, 660 N.E.2d 1121, 1126 (1995)).

[155] *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50, 860 N.E.2d 713, 717 (2006) (citations omitted)

[156] *See Edidin v. Uptown Gallery, Inc.*, 2010 U.S. Dist. LEXIS 31842, at *5, 2010 WL 1252666, at *2 (S.D.N.Y. Mar. 31, 2010) (Gorenstein, J.) ("[Consignor] retained title to her artwork when she delivered it . . . on consignment, and [consignee] has interfered with [consignor's] ownership of the artwork by its failure to either return the artwork or deliver the sales proceeds . . . ."), *report adopted*, 2010 U.S. Dist. LEXIS 53329, 2010 WL 2194817 (S.D.N.Y. Jun. 1, 2010) (Cote, J.); *see also House of Diamonds, Inc. v. Borgioni LLC*, 737 F.Supp.2d 162, 171–72 (S.D.N.Y. 2010) (Ellis, J.) ("***Borgioni***") (granting summary judgment on claim for conversion where plaintiff alleged it sent Defendant diamonds on consignment and defendant failed to return them upon request).

And here, unlike with respect to the fraudulent transfer claims, Mitch and Mehran are liable as well.  An officer or director of a corporate defendant may be liable for conversion if he or she personally fostered the conversion or was aware of the conversion and declined to set it right.[157]  And "an officer of a corporation who participates in the conversion of property of third persons on behalf of a corporation may still be personally liable."[158]  For example, officers and directors of a corporate auctioneer who misappropriated net proceeds of a consignment sale from the plaintiff were held to be individually liable to the plaintiff for conversion.[159]

In *Kalfco*, a seller of animal feed brought a conversion action against a defendant corporation that had warehoused the seller's animal feed.[160]  The conversion claim arose out of the defendant-warehouser's failure to return about $162,000 worth of feed, which it instead transferred to itself on credit without the consent of the feed company.[161]  Significantly here, in a separate but related action, the feed company also sought to impose liability for conversion on the defendant-company's manager, James Holman, and his wife, Caroline Holman, who acted as president, sole director, and sole shareholder of the defendant-corporation.[162]

The trial court entered judgments for conversion not just with respect to the corporate defendant, but also James Holman, who was in charge of the day-to-day operations of the defendant corporation (and who was primarily responsible for the conversion of the plaintiff's

---

[157]  *See, e.g., Am. Feeds and Livestock Co. v. Kalfco, Inc.*, 149 A.D.2d 836, 837, 540 N.Y.S.2d 354, 356 (3d Dep't 1989) ("***Kalfco***").

[158]  *See Prudential-Bache Secs. Inc. v. Golden Larch-Sequoia, Inc.*, 118 A.D.2d 487, 488, 500 N.Y.S.2d 1, 2 (1st Dep't 1986).

[159]  *Edwards v. Horsemen's Sales Co.*, 148 Misc.2d 212, 560 N.Y.S.2d 165 (Sup. Ct. N.Y. Cnty. 1989) (Greenfield, J.) (finding as a matter of law that officers and directors of the consignee were liable to the plaintiff for conversion, together with interest).

[160]  149 A.D.2d 836, 540 N.Y.S.2d 354.

[161]  *Id.* at 836, 540 N.Y.S.2d at 355.

[162]  *Id.* at 836–37, 540 N.Y.S.2d at 355.

-36-

property) and his wife Caroline Holman, who had a lesser role.[163]  On appeal, the Third

Department affirmed the judgment as to Caroline (apparently the only one as to whom liability

was debated), notwithstanding her lesser role.[164]

The Third Department noted that "officers or directors may not be held liable simply on

the basis of their authority . . . ; there must be evidence that [the officer or director] knowingly

fostered the conversion or was aware of the conversion and declined to exercise her ability to set

it right."[165]  And on the facts there, it found the latter basis sufficient to impose liability on

Caroline Holman.  Of relevance to the court was the fact that Caroline Holman was informed of

the plaintiff's demand for the withheld feed, and may have seen a telegram (directed to the

attention of James Holman) demanding that the feed be returned immediately.[166]  In addition, the

court noted that "it is not without significance that as the sole shareholder . . . she was the direct

beneficiary of the conversion."[167]  Based largely on this evidence, the court found that Caroline

Holman was on notice that the defendant-corporation was in possession of the plaintiff's

property without authority to do so, and failed, without excuse, to relinquish that wrongful

possession.  She was therefore liable for conversion.[168]

Similarly here, each of Mitch and Mehran was aware that Peykar International was

wrongfully in possession of Fine Diamonds' property.  Doran made repeated requests for the

return of the Transferred Diamonds to each of Mitch and Mehran, as did Lester to Mehran, and

Jeffrey to Mitch.  Requests were made by email, in person, and by phone.  Mitch and Mehran

---

[163]    *Id.*

[164]    *Id.* at 837–38, 540 N.Y.S.2d at 355–56.

[165]    *Id.* at 837, 540 N.Y.S.2d at 356 (citations omitted).

[166]    *Id.* at 838, 540 N.Y.S.2d at 356.

[167]    *Id.* (citation omitted).

[168]    *Id.*

each signaled his awareness of the need to return the Transferred Diamonds or their proceeds in

calls, emails and even recorded conversations.  And just as Caroline Holman was the direct

beneficiary of the conversion as sole shareholder, Mitch and Mehran were the direct

beneficiaries of the conversion as the sole owners of Peykar International.

Accordingly, Mitch and Mehran are personally liable for conversion as well.

*5. Fraudulent Misrepresentation*

Finally, Count 9 of the Amended Complaint seeks judgment, against Mitch and Mehran,

in that same $37,593,930.34 amount, for fraudulent misrepresentation.[169]  The Trustee asserts

that Mitch and Mehran became liable on this theory as well by fraudulently misrepresenting that

they were engaged in a legitimate diamond consignment enterprise, when in fact they were

engaged in a fraudulent scheme that would eventually bankrupt Fine Diamonds.[170]  While the

Court finds Mitch's and Mehran's conduct disgraceful, it cannot impose liability on the

additional ground of fraudulent misrepresentation.

Under New York law, a defendant will be liable for fraudulent misrepresentation if the

defendant:  (i) knowingly made a false statement; (ii) of a material fact; (iii) with the intent to

deceive the plaintiff; and (iv) the plaintiff justifiably relied on that statement; (v) to his injury.[171]

Under New York law, "[a] corporate officer is individually liable for fraudulent acts or false

representations of his own, or in which he participates, even though his actions in such respect

may be in furtherance of the corporate business."[172]

---

[169]    Am. Compl. at ¶¶ 93–103.

[170]    Pl. Post-Trial Br. at 32.

[171]    *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 122, 653 N.E.2d 1179, 1184 (1995); *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 406–07, 151 N.E.2d 833, 835 (1958).

[172]    *Tomoka Re Holdings, Inc. v. Loughlin*, No. 03 Civ. 4904, 2004 U.S. Dist. LEXIS 8931, at *19, 2004 WL 1118178, at *7 (S.D.N.Y. May 19, 2004) (Buchwald, J.) (citation omitted).

The Trustee directs the Court's attention to one case in particular. In *Borgioni*[173]—

where, as here, a consignee accepted diamonds and then failed to return or pay for them—the

plaintiff House of Diamonds consigned diamonds to one Joseph Zrelak ("**Zrelak**") over the

course of an approximately 10-month relationship.[174] Zrelak (who had delivered diamonds to

another diamond dealer, Chrissafis, who then sold them without paying Zrelak) failed to pay for

or return about $157,000 worth of diamonds to House of Diamonds.[175] The Court granted the

plaintiff consignor's summary judgment motion, which was unopposed, against consignee Zrelak

on several of the consignor's claims—including, as relevant here, a fraud claim.

Judge Ellis found as a fact that Zrelak received diamonds over a period of time, from July

2007 until May 2008, and that Zrelak's failure to pay for, or return the diamonds, began in

October 2007.[176] In this factual context, Judge Ellis determined that Zrelak's actions met the

elements of fraud because Judge Ellis found (among other elements of a cause of action for

fraud)[177] that Zrelak "represented to House of Diamonds that he was holding the diamonds on

consignment, which he knew was false since he had sold the diamonds to Chrissafis without

approval." [178]

Because the motion before him was unopposed, Judge Ellis had no occasion to issue a

more detailed opinion. But it appears to this Court that what caused Judge Ellis to find fraud

upon that factual showing (and not just to find conversion and the other bases for liability he

there found), and to find the necessary reliance by the plaintiff, was that Zrelak secured *more*

---

[173]    *See* n.156 above.

[174]    737 F.Supp.2d at 165.

[175]    *Id.*

[176]    *Id.*

[177]    One of those requirements was "reasonable reliance by the plaintiff." *Id.* at 171. That was not put in issue there, but is a problem here. *See* page 40 below.

[178]    *Id.* at 171.

diamonds based on his false representation, in addition to the earlier diamonds that Zrelak had likewise converted.

It is quite possible that here too, Doran was induced to give Peykar International additional diamonds on consignment after false statements by Mitch or Mehran, but the evidentiary record as to this here was too thin.  The Court cannot here make necessary findings as to timing, causation, and the value of any diamonds consigned to Peykar International after the fraudulent misrepresentations.  The significant instances of outright fraud—*e.g.*, those in October 2008 and thereafter, including Mehran's statements as to the additional safe that never existed—appear to have taken place after all of the Transferred Diamonds were already in the Peykars' hands.  While the Trustee fully met his burden of proof with respect to his separate claims for turnover, fraudulent transfer and conversion, he failed to meet his burden of proof on the extent to which Mitch or Mehran made any false representations *before* Doran gave Peykar International more diamonds, and that either made false statements upon which Doran or anyone else at Fine Diamonds relied.

## 6.  Prejudgment Interest

Finally, the Court considers the Trustee's entitlement to prejudgment interest.  The Trustee is entitled to prejudgment interest on the conversion claim,[179] and because each of the various Defendants here is liable on that claim, the Court need not discuss entitlement to interest on the others.[180]

---

[179]    *Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326, 402 N.E.2d 122, 125 (1980) ("***Fantis Foods***") ("The usual measure of damages for conversion is the value of the property at the time and place of conversion, plus interest.").

[180]    Of course, this Court has previously awarded prejudgment interest in a turnover action, *see Geron v. Peebler (In re Pali Holdings, Inc.)*, 491 B.R. 389, 393–95 (Bankr. S.D.N.Y. 2013) (Gerber, J.) and in avoidance actions (there to recover preferences).  *See Ames Merchandising Corp. v. Cellmark Paper Inc. (In re Ames Dep't Stores, Inc.)*, 450 B.R. 24, 35–36 (Bankr. S.D.N.Y. 2011) (Gerber, J.); *Ames Merchandising Corp. v. Unical Enterprises, Inc. (In re Ames Department Stores, Inc.)*, 2010 Bankr. LEXIS 5115, 2010 WL 6052849 (Bankr. S.D.N.Y. Sept.10, 2010) (Gerber, J.).  But because the rate at which to

Conversion is a state law claim, and the Court thus looks to New York law concerning awards of prejudgment interest on claims of that character.[181]  New York's CPLR provides for mandatory recovery of prejudgment interest with respect to "an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property."[182]  As the plain language of CPLR § 5001(a) requires, conversion is among those causes of action that qualify for recovery of prejudgment interest under this section.[183]

The interest rate to be applied is 9% per annum,[184] computed from "the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred . . . . or upon all of the damages from a single reasonable intermediate date."[185]

Here, until return of the consigned diamonds was demanded, Peykar International's possession of those diamonds was authorized.  Thus the Court fixes December 7, 2008—the date on which Doran and Lester first demanded return of the Transferred Diamonds—as "the earliest ascertainable date," or a "reasonable intermediate date."  The Trustee is entitled to prejudgment

---

award interest in matters of that character is more debatable; because liability there exists only against Defendant Peykar International, and judgment for conversion should be entered against *all* Defendants; and because the claims for conversion overlap with, and effectively trump, the federal claims, the Court focuses solely on the prejudgment interest to be awarded on the conversion claims.

[181]  *Adrian v. Town of Yorktown*, 620 F.3d 104, 106 (2d Cir. 2010) ("[P]rejudgment interest is a matter of substantive law [so] the New York interest rate applies to the interest sought.").

[182]  N.Y. CPLR § 5001(a).

[183]  *See Fantis Foods* in n.179 above.  *See also Della Pietra v. State*, 125 A.D.2d 936, 938, 510 N.Y.S.2d 334, 337 (4th Dep't 1986) (affirming award of prejudgment interest on conversion); *In re Buonicontri*, 26 Misc. 3d 1211(A), at *5 (Sup. Ct. Richmond Cnty. 2010) (Aliotta, J.) ("causes of action such as . . . conversion . . . qualify for the recovery of prejudgment interest under [section 5001].") (citation omitted) (unreported disposition).

[184]  *See* N.Y. CPLR § 5004.

[185]  N.Y. CPLR § 5001(b).

interest at 9% per annum from December 7, 2008 through the date of the entry of the judgment in this case, on $37,593,930.34.[186]

Conclusion

Judgment should be entered in favor of the Trustee and against Peykar International, Mitch, and Mehran, jointly and severally, in the amount of $37,593,930.34[187] plus interest at 9% from December 7, 2008, on the conversion claim.[188]  Although the Trustee has shown an additional entitlement to judgments in his favor as against Peykar International for turnover and for the value of the avoided fraudulent transfers (and the Court believes that it constitutionally could enter them), the Court does not now do so, for the reasons set forth above, and because they are subsumed and effectively mooted by the conversion claims.[189]

---

[186]    The Trustee asserts that this Court has the discretion to award prejudgment interest on the other counts as well.  Having determined that the Trustee is entitled to prejudgment interest on the conversion claim (with respect to which judgment should be entered against all defendants), it is unnecessary for the Court to exercise its discretion in finding that the Trustee is entitled to prejudgment interest on the other claims as well.

[187]    Defendants contended the underlying evidence did not support the entire amount claimed by the Trustee.  The Court's independent review of the amount due from testimony and exhibits admitted at trial supports a finding that the value of the Transferred Diamonds was $37,593,930.34, an amount supported by Plaintiff's Exhibit 3, and the Court enters judgment in that amount.

[188]    Although the Trustee additionally requested an award of attorneys fees, that request should be denied.  No statute authorizes an award of attorneys fees here, nor has any other basis for such an award been shown.  *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975) ("In the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.").

[189]    *See* n.3 above.  Obviously, some measures must be taken to preclude a double (or triple) recovery on behalf of the Trustee, a matter that is made more difficult by reason of a bankruptcy judge's constitutional power to enter a final judgment on only some of the claims.  At this point, the Court believes that it should give the district court flexibility in determining the nature and extent of any judgments entered in this adversary proceeding.

This is a Decision only, and neither an order nor judgment.  Under Fed.R.Bankr.P. 7058 and Fed.R.Civ.P. 58, the judgment will need to be embodied in a separate document.  At this point, this Decision should be deemed to be this Court's Proposed Findings of Fact and Conclusions of Law, subject to the procedures set forth in Fed.R.Bankr.P. 9033.  An order (but once again, not a judgment) implementing Bankruptcy Rule 9033's noticing requirements—addressing the fact that each of the Defendants' two former counsel was permitted to withdraw, and that special measures should be taken to provide effective notice to the Defendants—is being entered in connection with this Decision.

Dated: New York, New York          _*s/Robert E. Gerber*___
      October _**11**_, 2013          United States Bankruptcy Judge